*County Council of Prince George's County, Md., Sitting as the District Council v. FCW Justice, Inc.,* No. 2664, September Term 2014, Opinion by Kehoe, J.


**LAND USE – MARYLAND-WASHINGTON REGIONAL DISTRICT ACT – DISTRICT COUNCIL REVIEW OF PLANNING BOARD DECISIONS**

The County Council of Prince George's County, sitting as the District Council, exercises appellate, and not *de novo,* jurisdiction when it reviews a decision by the Prince George's County Planning Board that granted or denied an application for detailed site plan approval when the site plan was submitted to the Planning Board in compliance with a condition of an approval of a subdivision application in a Euclidean zoning district. Review and approval of such a detailed site plan is a "local function," over which the Planning Board has exclusive primary jurisdiction. *See* Md. Code Ann., § 20-202(b)(1) of the Land Use Article; *County Council of Prince George's County v. Zimmer Development Co.*, 444 Md. 490, 569-70 (2015).

Circuit Court for Prince George's County
Case No. CAL 13-37573

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 2664

September Term, 2014

_____

COUNTY COUNCIL OF PRINCE
GEORGE'S COUNTY, MD., SITTING AS
THE DISTRICT COUNCIL

v.

FCW JUSTICE, INC.

_____

Graeff,
Kehoe,
Salmon, James P.
    (Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Kehoe, J.

_____

Filed: September 5, 2018

Pursuant to Maryland Uniform Electronic Legal Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Bessie Decker, Clerk
April 20, 2018

A site plan is "an illustrated proposal for the development or use of a particular piece of real property [depicting] how the property will appear if the proposal is accepted." Bryan A. Garner, BLACK'S LAW DICTIONARY 1599 (10th ed. 2014). Like most Maryland local government jurisdictions that exercise land use control, Prince George's County requires developers, in certain circumstances, to submit site plans for government review and approval as part of the development review process that occurs after zoning approval has been obtained. The amount of information to be shown on a site plan varies based upon a variety of factors, e.g., the proposed use, the location of the property, the uses of adjacent properties, and the specific review and approval process required for the proposed development. The initial reviewing and approving authority for all site plans is the Prince George's County Planning Board. The Planning Board's decisions may be subject to further review by the Prince George's County Council, sitting as the District Council.

In *Prince George's County v. Zimmer Development*, 444 Md. 490, 584 (2015), the Court of Appeals held that the District Council exercises appellate jurisdiction when it reviews decisions of the Planning Board approving or denying two types of site plans that are required as part of the review process for projects located within one of the County's comprehensive design zoning districts: "comprehensive design plans," and "specific design plans." The Court further held that, because it exercises appellate jurisdiction, the District Council can reverse the Planning Board's decision "only if the Board's decision was not supported by substantial evidence, was arbitrary, capricious, or illegal otherwise[.]" *Id.*

In this appeal from a judgment of the Circuit Court for Prince George's County, we must decide how *Zimmer's* teachings as to the nature of the District Council's jurisdiction and the scope of its review apply to the Council's review of a decision by the Planning Board approving a "detailed site plan" that was submitted by a property owner as part of a subdivision review and approval process.

*Zimmer* suggests to us that the District Council exercises appellate jurisdiction in reviewing a decision by the Planning Board approving or denying a detailed site plan, at least when the plan is submitted to the Board as a condition of the Board's approval of a preliminary subdivision application in an Euclidean zoning district. Because the Planning Board's decision in the present case was supported by substantial evidence, and was neither flawed by a legal error nor otherwise arbitrary or capricious, the District Council erred when it reversed the Planning Board's decision. Therefore, we will affirm the judgment of the circuit court.

## Background

### 1. An Abbreviated Statutory Overview

### A. The Regional District Act

Prince George's County derives its authority to engage in land use regulation from the Maryland-Washington Regional District Act (the "RDA").[1] *Zimmer*, 444 Md. at 524–25; *County Council of Prince George's County v. Brandywine*

---

[1] The Maryland-Washington Regional District includes all of Prince George's County "except for the City of Laurel, as its boundaries existed on July 1, 2008." Md. Code Ann., Land Use Article § 20-101(b)(2).

*Enterprises, Inc.*, 350 Md. 339, 342 (1998). The RDA is now codified as Md. Code Ann. (2012), Division II of the Land Use Article ("LU"). The provisions of the RDA relevant to the issues raised in this appeal are implemented in Prince George's County through Titles 24 (Subdivisions) and 27 (Zoning) of the Prince George's County Code ("PGCC"). In the present case, we are primarily concerned with Title 27—the Prince George's County Zoning Ordinance.

The RDA and PGCC Title 27 are complicated statutes with many moving parts. Writing for the Court in *Zimmer,* the Honorable Glenn T. Harrell, Jr. examined portions of the RDA and Title 27 in the context of underlying principles of land use law to give context to the contentions raised in that case. 444 Md. at 501–36. Judge Harrell's cogent and thorough analysis is our starting point, and we will refer to it frequently in the ensuing pages.

Land use control in the Regional District operates on the same conceptual bases as does land use regulation in the rest of the State. There are two broad categories of land use control: zoning and planning (which includes subdivision regulation).[2] *Zimmer,* 444 Md. at 505 (citing, among other authorities, *Appleton Regional Community Alliance v. County Comm'rs of Cecil County,* 404 Md. 92, 102 (2008); and *Mueller v. People's Counsel for Baltimore County,* 177 Md. App. 43, 68 (2007)).

---

[2] Some authorities treat subdivision control and planning as different functions. *See County Commissioners of Cecil County v. Gaster*, 285 Md. 233, 246 (1979) ("There are three integral parts of adequate land planning, the master plan, zoning, and subdivision regulations.").

"Zoning" is "the process of setting aside disconnected tracts of land varying in shape and dimensions, and dedicating them to particular uses designed in some degree to serve the interests of the whole territory affected by the plan." *Zimmer,* 444 Md. at 505 (quoting *Maryland Overpak Corp. v. Mayor and City Council of Baltimore*, 395 Md. 16, 48 (2006)). Necessarily implicit in the power to establish use districts and zoning regulations is the authority to enforce their strictures. Accordingly, "[a]s a general rule, parcels must be used in compliance with their zoning[.]" *Id.*[3]

The Prince George's County Zoning Ordinance contains provisions for both "Euclidean" and "floating" zoning districts. As the Court explained in *Zimmer*:

> Under a Euclidian zoning scheme, a zoning authority divides geographically an area into use districts. Certain permitted uses are specified by local ordinance and allowed in particular geographic areas. These geographic areas and the zoning assigned to them are then recorded on an official zoning map. The number of classifications that are available to be applied within a district has increased exponentially since the early schemes, but Euclidian zoning remains a basic framework for implementation of land use controls at the local level.

444 Md. at 511 (citations and quotation marks omitted).

Floating zones provide a means by which a local zoning authority can tailor regulations to foster higher quality development in "large commercial and

---

[3] Legal non-conforming uses are the exception to the rule. *Zimmer*, 444 Md. at 505. Another panel of this Court has addressed the appropriate role of the District Council in reviewing decisions by the Planning Board regarding non-conforming uses in *County Council of Prince George's County v. Convenience & Dollar Plus Market/Eagle Management Company*, No. 1415, September Term 2014, which will be filed simultaneously with this opinion.

4

industrial uses, mixed uses, multifamily residences, and planned unit developments." *Id.* at 515 (footnote, citations and quotation marks omitted).[4]

The concept of "planning" is broader in scope. "Planning concerns 'the development of a community, not only with respect to the uses of lands and buildings, but also with respect to streets, parks, civic beauty, industrial and commercial undertakings, residential developments and such other matters affecting the public convenience[.]'" *Zimmer*, 444 Md. at 505 (quoting 1 E.C. YOKLEY, ZONING LAW AND PRACTICE § 1–2 (4th ed. 1978) (other citation omitted)). One aspect of planning is the formulation of "plans," i.e. documents (typically approved by the local legislature) that "contain elements concerning transportation and public facilities, recommended zoning, and other land use recommendations and proposals." *Mayor & Council of Rockville v. Rylyns Enterprises*, 372 Md. 514, 529 (2002). Subdivision control, i.e., the regulation of process by which larger tracts of land are divided into smaller ones, generally for the purpose of residential, commercial, and industrial development, is an inherent aspect of the planning function. *Zimmer*, 444 Md. at 505 (citing *Richmarr Holly Hills, Inc. v. American PCS, L.P.*, 117 Md. App. 607, 645–46 (1997); *see also*

---

[4] A detailed discussion of the differences between Euclidean and floating zoning districts is beyond the scope of this opinion. Floating zone regulations are generally used to allow large scale commercial and mixed-use projects such as planned use developments. "'Floating zones tend to be plan-implementation mechanisms,' by which zoning decision-makers may carry out planning goals." *Zimmer*, 444 Md. at 518 (quoting *Richmarr Holly Hills v. American PCS*, 117 Md. App. 607. 637 (1997) (footnote omitted).

The property in question in *Zimmer* is located in a floating zone. 444 Md. at 537. On the other hand, FCW's property is in the I-1 district, which is a Euclidean zone.

*County Commissioners of Cecil County v. Gaster*, 285 Md. 233, 249 (1979) (Without subdivision controls, "[p]lanning would be futile[.]")

The two concepts overlap. "Because 'planning and zoning complement each other and serve certain common objectives,' some implementation and enforcement procedures may have both planning and zoning aims." *Zimmer*, 444 Md. at 506 (quoting *People's Counsel for Baltimore County v. Surina*, 400 Md. 662, 689 (2007)).

What we have said so far applies to every jurisdiction in Maryland that exercises land use control authority. What makes Montgomery and Prince George's Counties different is the way that planning and zoning authority within those counties is allocated among four agencies: the Maryland-National Park and Planning Commission (the "Commission"), the planning board of each county, the county councils (which are referred to "district councils" when they exercise powers granted to them in the RDA), and the county boards of appeal.[5] This allocation is largely, but not quite entirely, set out in the RDA. Where the statute speaks, it controls. *See Zimmer*, 444 Md. at 571.

Regional planning functions are within the ambit of the Commission. *See* LU§ 20-203. The Commission is a non-partisan State agency consisting of ten

---

[5] The powers and duties of the Prince George's County Board of Appeals are set out in LU §§ 22-308–311. They are not relevant to the issues raised in this appeal.

members, five chosen from Montgomery County and five from Prince George's County. LU § 15-102.[6]

The five members of the Commission from each county also serve as the planning board for that county. LU § 20-201. The planning boards have responsibilities that are distinct from the Commission. The Legislature set out the powers and duties of the planning boards in LU §§ 20-202 and 20-207.

Section 20-202 states in pertinent part (emphasis added):

(a)(1) Subject to paragraph (2) of this subsection, a county planning board:
(i) is responsible for planning, subdivision, and zoning functions that *are primarily local in scope*; and
(ii) shall exercise, within the county planning board's jurisdiction, the following powers:
1. planning;
2. zoning;
3. subdivision;
4. assignment of street names and house numbers; and
5. any related matter.
                    *   *   *
(b)(1) A county planning board has *exclusive jurisdiction* over:
(i) *local functions*, *including*:
1. the administration of subdivision regulations;

---

[6] As the Court noted in *Zimmer*:

The RDA evinces also an intent of the State Legislature to prevent corruption of or the appearance of impropriety by the commissioners. LU § 15–120 prohibits commissioners from: (1) participating in decisions as a commissioner in which the commissioner or the commissioner's immediate family has a financial interest; (2) taking certain employment while a commissioner; (3) soliciting or accepting gifts, disclosing confidential information, or using such information for private gain; or, (4) influencing other county or State officials in the conduct of their duties. Commissioners are required by the RDA to disclose publically any conflict with his or her official duties. LU § 15–120(g).

444 Md. 528.

7

2. the preparation and adoption of recommendations to the district council with respect to zoning map amendments; and
3. the assignment of street names and house numbers in the regional district

\*     \*     \*

As a general rule, "including" means "including by way of illustration and not by way of limitation." General Provisions Article § 1-110. *See also Hackley v. State*, 389 Md. 387, 393 (2005) ("Legislative drafters are to 'use "means" if the definition is intended to be exhaustive' . . . and to 'use "includes" if the definition is intended to be partial or illustrative[.]'" (quoting Department of Legislative Services, MARYLAND STYLE MANUAL FOR STATUTORY LAW 27 (1998) (some brackets omitted)). Consistent with this principle, the *Zimmer* Court noted that "LU § 20-202(b)(i) provides that the county planning boards have 'exclusive jurisdiction' over 'local functions,' but does not detail each of the local functions within each jurisdiction." 444 Md. at 567 (footnotes omitted).

Section 20-207[7] provides that "functions not specifically allocated in this subtitle shall be assigned to the Commission or to one or both of the county planning boards, as needed." Such assignments must be approved both by the Commission and the county council.

---

[7] Section 20-207 states:

> (a) Subject to subsection (b) of this section, functions not specifically allocated in this subtitle shall be assigned to the Commission or to one or both of the county planning boards, as needed.
> (b) The assignments shall:
> (1) be made by resolution of the Commission with the approval of the respective county council; and
> (2) carry out the policy that local or intracounty planning functions should be performed by the county planning boards.

8

Approval by the county council may be evidenced by a provision in a local land use ordinance. *Zimmer*, 444 Md. 566. The Commission's approval can be inferred from the Commission's administrative practices. *Id.* at 566–67 ("The MNCPPC appears to have accepted the assignment, as the Planning Board considers, in practice, CDPs and SDPs." (footnote omitted)).

There is no single provision of the RDA that sets out the land use control authority of the district councils. However, and among other things, the district councils have the power to adopt and amend zoning laws, LU § 22-104; to establish programs for the transfer of development rights, LU § 22-105; to establish procedures for the resolution of disputes as to building permits and other "zoning questions," LU § 20-503; and to enact historic preservation regulations, LU § 22-108.

In addition, and pertinent to this appeal, the Prince George's County District Council is authorized to "review a final decision of the county planning board to approve a detailed site plan." LU § 25-210.[8] The term "detailed site plan" is not defined in the RDA, but, as

---

[8] Section 25-210 states in full:

> (a)(1) Subject to subsection (b) of this section, the district council may review a final decision of the county planning board to approve or disapprove a detailed site plan.
> (2) A party of record may appeal to the district council a final decision by the county planning board to approve or disapprove a site plan.
> (b) The district council may only decide whether to review the final approval or disapproval of a detailed site plan under this section within 30 days after the date the final approval or disapproval was issued.
> (c)(1) Except as provided in paragraph (2) of this subsection, if the district council decides to review an approval or a disapproval under this section, the district council shall hold a hearing within 70 days after the district council issues the decision to conduct a review.

we will soon explain, the detailed site plan review and approval process is set out in detail in the PGCC.

As LU §§ 20-202 and 25-210 suggest, the Prince George's County Planning Board has the authority to review and act on detailed site plan applications. Moreover, the RDA gives the District Council the authority to revoke the Planning Board's detailed site plan review authority under certain circumstances and to delegate that function to the governing bodies of municipalities located within the Prince George's County part of the Regional District. *See* LU §§ 25-210(e)[9] and 25-301.[10] (The authority to revoke and delegate is the

---

(2) The district council may decide to extend the time to hold a hearing under paragraph (1) of this subsection for up to 45 additional days on its own motion or on request of the applicant.
(d) The district council shall issue a final decision within 60 days after the date of the hearing.

[9] Section 25-210(e) states:

The district council may revoke a delegation of site plan approval authority to the county planning board only for the purpose of delegating approval authority over detailed site plans to the governing body of a municipal corporation in the regional district under § 25-301(c)(2)(ix) of this title.

[10] Section 25-301 reads in pertinent part:

(a) Except as otherwise provided in this section, the district council may provide that the governing body of a municipal corporation may exercise the powers of the district council as specified in this subtitle.
(b) When exercising authority delegated under subsection (c) or (d) of this section, the governing body of a municipal corporation:
(1) shall be subject to the substantive and procedural requirements and standards established by the district council; and
(2) may not impose:
(i) with respect to general delegation under subsection (c) of this section, a different requirement or standard than the requirements or standards that would apply if the district council had not delegated its authority to the municipal corporation; or

centerpiece of one of the District Council's contentions in this appeal, which we will address later.)

## B. Detailed Site Plans

Before certain kinds of development activities can occur in Prince George's County, the developer must submit a detailed site plan[11] to the Planning Board for

---

(ii) with respect to delegation in a revitalization overlay zone under subsection (d) of this section, a stricter requirement or standard than the requirements or standards that would apply if the district council had not delegated its authority to the municipal corporation.

(c)(1) This subsection applies to land in a municipal corporation in the regional district.

(2) The district council may delegate to the governing body of a municipal corporation the powers of the district council regarding:

(i) design standards;

(ii) parking and loading standards;

(iii) sign design standards;

(iv) lot size variances and setback and similar requirements;

(v) landscaping requirements;

(vi) certification, revocation, and revision of nonconforming uses;

(vii) minor changes to approved special exceptions;

(viii) vacation of municipal rights-of-way; and

(ix) except as provided in paragraph (3) of this subsection, all detailed site plans.

(3) The authority to delegate with regard to detailed site plans does not apply to detailed site plans:

(i) for a zone that requires detailed site plan approval by the district council;

(ii) that are required as a condition of approval of a zoning map amendment or a preliminary plan of subdivision; (iii) for which the approval of a conceptual site plan or a preliminary plan of cluster subdivision is required; or

(iv) that are required for designated parcels as a specific condition of a sectional map amendment.

\* \* \*

[11] Detailed site plans:

(1) depict the specific location of buildings, parking facilities, other structures and green spaces;

its review and approval. PGCC §§ 27-282 and 27-285. The legislative premise of the detailed site plan review process is that "regulation of land development through fixed standards can result in monotonous design and lower quality development, [therefore] certain types of land development are best regulated by a combination of development standards and a discretionary review. . . ." PGCC § 27-281. Examples of the types of development that are appropriate for detailed site plan review include: development on environmentally sensitive land, development that "is potentially incompatible with land uses on surrounding properties," and "[b]uildings or land uses that are a part of particularly sensitive views as seen from adjacent properties or streets." PGCC § 27-281(a)(1)(H)–(J).

Detailed site plans are required as a matter of course in some zoning districts. PGCC § 27-281.01(a)(1). Additionally, the Planning Board or the District Council may require detailed site plan review and approval "in a zoning or subdivision case, a sectional map amendment, or otherwise." PGCC § 27-281.01(a)(2). Ordinarily, a detailed site plan must address twenty-one separate criteria. *See* PGCC § 27-

(2) provide detailed information about "grading, planting, sediment control, woodland conservation areas, regulated environmental features and storm water management features proposed for the site";
(3) describe "the specific recreation facilities proposed, architectural form of buildings, and street furniture (such as lamps, signs, and benches) proposed for the site", and
(4) when necessary, describe any maintenance agreements, covenants, etc. "that are necessary to assure that the [detailed site plan] is implemented[.]"

PGCC § 27-281(c).

12

282(e).[12] However, "the authority requiring the review" may limit the information required. PGCC § 27-286(a).

---

[12] PGCC § 27-282(e) states:

A Detailed Site Plan shall include the following:
(1) Location map, north arrow, and scale;
(2) Boundaries of the property, using bearings and distances (in feet); and either the subdivision lot and block, or liber and folio numbers;
(3) Zoning categories of the subject property and all adjacent properties;
(4) Locations and types of major improvements that are within fifty (50) feet of the subject property and all land uses on adjacent properties;
(5) An approved Natural Resource Inventory;
(6) Street names, right-of-way and pavement widths of existing streets and interchanges within and adjacent to the site;
(7) Existing rights-of-way and easements (such as railroad, utility, water, sewer, access, and storm drainage);
(8) Existing site and environmental features as shown on an approved NRI;
(9) A Type 2 Tree Conservation Plan prepared in conformance with Division 2 of Subtitle 25 and The Woodland and Wildlife Habitat Conservation Technical Manual or a Standard Letter of Exemption;
(10) A statement of justification describing how the proposed design preserves and restores the regulated environmental features to the fullest extent possible;
(11) An approved stormwater management concept plan;
(12) Proposed system of internal streets including right-of-way widths;
(13) Proposed lot lines and the dimensions (including bearings and distances, in feet) and the area of each lot;
(14) Exact location and size of all buildings, structures, sidewalks, paved areas, parking lots (including striping) and designation of waste collection storage areas and the use of all buildings, structures, and land;
(15) Proposed grading, using one (1) or two (2) foot contour intervals, and any spot elevations that are necessary to describe high and low points, steps, retaining wall heights, and swales;
(16) A landscape plan prepared in accordance with the provisions of the Landscape Manual showing the exact location and description of all plants and other landscaping materials, including size (at time of planting), spacing, botanical and common names (including description of any plants that are not typical of the species), and planting method;
(17) Exact location, size, type, and layout of all recreation facilities;

13

Before deciding to approve a detailed site plan, the Planning Board must find that "the plan represents a reasonable alternative for satisfying the site design guidelines, without requiring unreasonable costs and without detracting substantially from the utility of the proposed development for its intended use." PGCC § 27-285(b). As the Court explained in *Zimmer*, the detailed site plan process "is a method of moderating design guidelines so as to allow for greater variety of development, while still achieving the goals of the guidelines." 444 Md. at 562–63. Once approved, a detailed site plan is valid for three years. PGCC § 27-287.

### 3. The District Council's Authority to Review Planning Board Detailed Site Plan Decisions

The District Council is authorized to review certain categories of decisions by the Planning Board either through an appeal by a party of record in the proceeding or by the Council's own election to review the decision, a process known as

---

(18) Exact location and type of such accessory facilities as paths, walks, walls, fences (including widths or height, as appropriate), entrance features, and gateway signs (in accordance with Section 27-626 of this Subtitle);
(19) A detailed statement indicating the manner in which any land intended for public use, but not proposed to be in public ownership, will be held, owned, and maintained for the indicated purpose (including any proposed covenants or other documents);
(20) Description of the physical appearance of proposed buildings (where specifically required), through the use of architectural elevations of facades (seen from public areas), or through other illustrative drawings, photographs, or renderings deemed appropriate by the Planning Board; and
(21) Any other pertinent information.

"calling up." PGCC §§ 27-228.01[13] and 27-290(a).[14] The Zoning Ordinance also provides that, in such proceedings (whether by an appeal or by the District Council's decision to "call up" the Planning Board's decision), the District Council exercises "original jurisdiction." PGCC § 27-132(f).[15]

---

[13] Section 27-228.01 states in pertinent part:

(a) In any of the following cases, a person of record may file an appeal from a final Planning Board decision to the District Council, or the Council on its own motion may elect to review a Board decision:

\* \* \*

(8) Detailed Site Plans, Section 27-290[.]

\* \* \*

[14] Section 27-290 states in pertinent part:

(a) The Planning Board's decision on a Detailed Site Plan may be appealed to the District Council upon petition by any person of record. . . . The petition [of appeal] shall be filed with the Clerk of the Council within thirty (30) days after the date of the notice of the Planning Board's decision. The District Council may vote to review the Planning Board's decision on its own motion within thirty (30) days after the date of the notice. . . .

\* \* \*

(c) The District Council shall schedule a public hearing on the appeal or review.

(d) Within sixty (60) days after the date the appeal petition is filed or the District Council elects to review the Detailed Site Plan application, the Council shall affirm, reverse, or modify the decision of the Planning Board, or remand the Detailed Site Plan one time to the Planning Board to take further testimony or reconsider its decision in accordance with specified grounds stated in the Order of Remand adopted by the Council. Where the Council approves a Detailed Site Plan, it shall make the same findings which are required to be made by the Planning Board. If the Council fails to act within the specified time, the Planning Board's decision is automatically affirmed.

\* \* \*

[15] Section 27-132 states in relevant part:

Sec. 27-132. - District Council hearing procedures.

\* \* \*

(f) Jurisdiction.

15

As the *Zimmer* Court noted*,* however, the proper scope of PGCC § 27-132(f) is far less expansive than its language, considered in isolation, might suggest:

> A provision of the county ordinance, such as PGCC § 27–132(f), that purports to give the District Council (or any other body) the authority to decide, *de novo*, a local function related to planning, zoning, subdivision, or the assignment of street names and house numbers, is invalid. The District Council may not arrogate to itself original jurisdiction where the RDA places that responsibility elsewhere. Only the General Assembly, through amendment of the RDA, may accomplish that objective.

444 Md. at 571.[16]

### 4. The Property, the Project, and the Planning Board's Decision

FCW Justice, Inc. ("FCW") is the owner of a 3.3 acre parcel located on Lottsford Vista Road in Lanham, Maryland. The property, at the time part of a larger tract, was zoned Light Industrial (I-1) in the 1960s and has retained that classification ever since. The I-1 zone is Euclidean, and detailed site plan approval is not ordinarily required before development occurs.

In 2003, the then-owner of the property filed an application to subdivide a portion of the larger tract into two lots, identified as "Parcels B and C, Hanson-Palmer Industrial

---

(1) In deciding an appeal to the District Council, or Council election to review a decision made by the Zoning Hearing Examiner or the Planning Board, the Council shall exercise original jurisdiction.
(2) For any appeal or review of a decision made by the Zoning Hearing Examiner or the Planning Board, the Council may, based on the record, approve, approve with conditions, remand, or deny the application.

[16] *See also Zimmer*, 444 Md. at 526 n.30 ("To the extent that the Charter, or the ordinances adopted thereunder, conflict with the RDA, the Charter and ordinances are invalid and the RDA governs." (citing *Prince George's County v. Maryland–Nat'l Capital Park & Planning Commission*, 269 Md. 202, 223 (1973))).

Park." We are concerned with Parcel C. The Planning Board granted preliminary subdivision approval, subject to many conditions, including one that required the owner to submit a limited detailed site plan[17] to the Board for its approval before a building permit is issued for Parcel C. The Board's resolution stated that the detailed site plan was to address three issues: building design, signage, and screening. The developer submitted a detailed site plan, which called for the construction of an 11,598-square-foot auto body shop with 20 service bays. The Planning Board docketed the application as "DSP-03089," and approved it in 2004. The auto body shop was never constructed, and the detailed site plan approval expired three years later, pursuant to PGCC § 27-287. This brings us to the present controversy.

FCW purchased the property in 2012. It proposes to build a 12,755-square-foot building on the property, which would house three uses: a car wash, a laundromat, and a restaurant. The carwash would consist of 7,900 square feet, with two drive-through lanes and a two-bay detail shop. The laundromat would occupy 3,057 square feet. Finally, the restaurant would contain 36 seats, as well as a small outdoor seating area. All of these uses are permitted by right in the Light Industrial zoning district.

---

[17] PGCC § 27-286(a) states:

> In general, the required findings and site design guidelines and criteria are intended to apply to the review of all Detailed Site Plans. . . . However, a more limited review may be imposed by [the authority] requiring the review. In these cases, specific issues to be reviewed shall be stated. Only those submittal requirements (Section 27-282) and site design guidelines (Section 27-283) which apply to the issue shall be considered.

17

In accordance with the condition imposed by the Planning Board when it granted preliminary subdivision approval in 2003, FCW submitted a detailed site plan for its proposed project. The Board's staff docketed the application as "DSP-03089/01."[18] In addition to the detailed site plan application itself, FCW also submitted a landscape plan, a photometric plan, a tree conservation plan, a conceptual stormwater management plan, drawings depicting all four sides of the proposed building, and a perspective drawing illustrating how the building would appear from Lottsford Vista Road. The proposed site plan and its accompanying information was reviewed by the Commission's staff, a process that also involved forwarding the detailed site plan to various state and local technical departments and agencies for review and comment.

On May 22, 2013, the Commission staff issued its report, which recommended that the Planning Board approve the detailed site plan application. Initially, the staff noted that each of the proposed uses was permitted as a matter of right in the I-1 zoning district, and that the project complied with the setback and green space requirements for that district.

---

[18] The District Council contends that the Planning Board should have assigned a separate docket number to the detailed site plan. As part of this argument, the District Council alleges that the Board erred by treating the Site Plan at issue in this case, DSP-03089/01 as a "revision" or "re-submittal" of a previously filed detailed site plan, DSP-03089, filed by the Property's previous owner, which expired in 2007.

We do not believe that the Planning Board erred in the way it identified FCW's application for its record-keeping purposes. Moreover, any hypothetical error is irrelevant. In its decision, the Board discussed the original site plan only in the context of providing the procedural history of the property. We agree with the District Council that DSP-03089/01 is a wholly separate detailed site plan from DSP-03089. The Planning Board was apparently of the same view.

The staff report also addressed whether the proposed detailed site plan conformed to the specific requirements of the 2003 Board resolution granting the subdivision application. As we have noted, the conditions relevant to the current appeal related to building design, signage, and screening. The staff report concluded that the detailed site plan satisfied the first of these three matters, and recommended minor changes to the other two.

*First,* the 2003 resolution provided that buildings should: (i) "include brick and/or other appropriate materials;" (ii) use "muted" exterior colors; and (iii) "be designed to appear more like an office building rather than a garage or warehouse, as example." The detailed site plan proposed one building constructed of red brick. Staff concluded that the building was "designed to appear like an office building with large glass windows and doors on the most visible northern and eastern facades."

*Second,* the 2003 resolution stated:

> Signs: A low, ground-mounted sign is preferred. Freestanding pole signs should not be permitted. Building-attached signs should not be permitted.

The detailed site plan proposed one ground-mounted sign that was nine feet high, and three four-foot-high signs mounted on the building to direct visitors to each business. Staff recommended that the proposed free-standing sign be reduced in height from nine to six feet. (The I-1 regulations allow free-standing signs of up to 25 feet in height.) The Staff also recommended that the Board condition approval on FCW's providing the dimensions of all proposed signs in a tabular format.

*Third,* the 2003 resolution stated that parking lots, service bays, and vehicle loading areas should be screened "through the use of landscaping, decorative walls or fences, and/or by the layout of the building, which could function as screening."

In its proposed detailed site plan, FCW proposed building a nine-foot-high brick wall, starting at the southeastern corner of the building, which would extend along the road frontage to the southern driveway entrance. FCW asserted that such a wall would effectively screen the car wash from the Lottsford Vista Road, and that the wall and existing woodlands areas would screen the proposed uses from the adjacent office sites. FCW also proposed to locate all service areas behind the building, out of sight from the street and adjacent office buildings. Staff concluded that the proposed screening was appropriate, although it recommended that pilasters be incorporated into the brick wall as an architectural embellishment and that the wall be reduced from nine to six feet in height.

The staff concluded that the detailed site plan met the statutory criteria and recommended that the Board approve the application subject to the modifications noted in the report.

The Planning Board held a public hearing on the application on June 6, 2013. Prior to the hearing, neighbors and nearby residents sent letters and e-mails to the Board objecting to the application. Many of these communications focused on the suitability of the proposed laundromat and car wash uses in the context of the surrounding neighborhoods. At the opening of the hearing, Elizabeth M. Hewlett, Esquire, the Board chair, addressed these issues. Ms. Hewlett informed the audience that the Board was aware of the concerns over the proposed carwash and laundromat. She noted that all three uses were permitted by

20

right in the I-1 district and that the Planning Board did not have the authority to deny the detailed site plan because of the proposed uses. After informing the audience that the Board "cannot make decisions based on plebiscite or popularity," Ms. Hewlett explained that the Board's ultimate decision would be based on whether the detailed site plan "meets the requirements of the Zoning Ordinance [and] the Subdivision Ordinance."

After the conclusion of the hearing, the Planning Board approved the detailed site plan application and documented its decision in Resolution No. 13-67. In the resolution, the Board summarized FCW's development proposal, and described the surrounding uses:

> The subject property is bounded to the north by a self-storage facility in the I-1 Zone; to the west and south by commercial/industrial office buildings in the I-1 Zone, which are part of the Hanson Palmer Business Park; and to the east by the public right-of-way of Lottsford Vista Road and beyond it by single-family homes in the R-T Zone. The recently developed Vista Gardens Marketplace Shopping Center in the C-S-C Zone is across Lottsford Vista Road to the northeast.

The Board then noted that: each of FCW's proposed uses (a laundromat, a restaurant, and a car wash) were uses permitted by right in the County's Light Industrial District; the proposed building layout, setbacks, and green spaces complied with the requirements of the Zoning Ordinance; and the proposed signage appeared to comply with the requirements of the Zoning Ordinance. Additionally, and as required by PGCC § 27-285(b)(1),[19] the

---

[19] Section 27-285 states in pertinent part:

> (b) Required findings.

> (1) The Planning Board may approve a Detailed Site Plan if it finds that the plan represents a reasonable alternative for satisfying the site design guidelines, without requiring unreasonable costs and without detracting substantially from the utility of the proposed development for its intended use. If it cannot make these findings, the Planning Board may disapprove the Plan.

21

Planning Board concluded that each of the specific items required to be addressed by the Subdivision Resolution had been addressed so FCW's detailed site plan represented a reasonable alternative for satisfying the site design guidelines without requiring unreasonable cost and without detracting substantially from the utility of the proposed development for its intended use. The Board approved the detailed site plan.[20]

### 5. The Proceedings before the District Council

No appeal of the decision of the Planning Board was filed by any party of record. However, the District Council exercised its authority to review the decision on its own motion, and held a public hearing on September 23, 2013. Counsel for FCW presented argument in favor of the proposal. Four individuals addressed the District Council in opposition. They raised concerns about traffic, the market viability of the laundromat, healthy food options, loitering, and other issues that were not specifically related to the matters before the Planning Board. At the conclusion of the hearing, the case was taken under advisement. On November 19, 2013, the District Council adopted an order reversing and denying the decision of the Planning Board, based upon an accompanying sixty-three page explanation of its reasoning. The District Council perceived several flaws in the Planning Board's decision.

The District Council found that the Planning Board failed to consider whether FCW's detailed site plan conformed to the land use recommendations of the current master plan

---

[20] The Board's approval was subject to a number of technical conditions that generally related to design details. The District Council does not contest the appropriateness of any of these conditions.

for the planning area within which the property is located—the 2010 Glen Dale–Seabrook–Lanham and Vicinity Master Plan.[21]

From this premise, the District Council conducted its own review of the pertinent provisions of the 2010 Master Plan. The Council concluded that FCW's detailed site plan was flawed in terms of the architectural design of the building, the location of the building on the property, the location of the proposed parking areas, the amount of screening from Lottsford Vista Road, provisions for exterior nighttime lighting, and possible construction within a utilities easement.

The District Council also noted that the property was located within the watershed of Folly Branch (a tributary of the Patuxent River) and acknowledged that there was no evidence in the record that FCW's project would adversely affect the water quality in Folly Branch. Nonetheless, the District Council declared that it was "simply not persuaded by the lack of evidence" that there would be no adverse effect to Folly Branch.

The District Council "reject[ed]" the analysis of the County's planning staff that the proposed uses would not have a substantial impact on traffic. After conducting its own independent review of the transcript of the Planning Board hearing, as well as staff reports, the District Council was "persuaded by the substantial evidence in the record that the proposed [development] adjacent to another high-impact self-storage facility and its proximity [to a nearby shopping center] will generate more traffic to existing traffic congestion, hazards and accidents" on Lottsford Vista Road.

---

[21] The District Council's finding was incorrect. The Planning Board's resolution did in fact address compliance with the Master Plan. We will return to this matter later in the opinion.

23

## 6. The Circuit Court Proceedings and the Appeal

FCW filed a petition for judicial review. On February 2, 2015, the Circuit Court for Prince George's County issued a well-reasoned opinion and order reversing the decision of the District Council and ordering the District Council to affirm the decision of the Planning Board in its entirety.

The District Council noted a timely appeal and raises three issues, which we have reworded somewhat.

> 1. Does the District Council exercise appellate or *de novo* review when it reviews a final decision of the Planning Board to approve or disapprove a detailed site plan?
>
> 2. Was the District Council's review of the Planning Board's decision limited to the three matters to be addressed by FCW's detailed site plan, *viz.*, building materials and architecture, signs, and screening?
>
> 3. Was the District Council's decision supported by substantial evidence?

We hold that the District Council exercises appellate jurisdiction when it reviews a decision by the Planning Board approving or denying a detailed site plan that is submitted to the Board pursuant to a requirement imposed by the Board's approval of a preliminary subdivision application for a property located in a Euclidean zoning district. Additionally, when the District Council reviews a decision of the Planning Board granting or denying a detailed site plan application, the Council's review is limited to the specific issues addressed by the Planning Board. The third issue raised by the District Council is immaterial—in light of the limited scope of the District Council's review, the pertinent inquiry is whether the *Planning Board's* decision was supported by substantial evidence.

### 7. The Standard of Review

Our standard of review in judicial review proceedings is well-established:

> When we review the final decision of an administrative agency, such as the Board of Appeals, we look through the circuit court's and intermediate appellate court's decisions, although applying the same standards of review, and evaluate the decision of the agency. Judicial review of administrative agency action is narrow. The court's task on review is not to substitute its judgment for the expertise of those persons who constitute the administrative agency. In our review, we inquire whether the zoning body's determination was supported by such evidence as a reasonable mind might accept as adequate to support a conclusion. As we have frequently indicated, the order of an administrative agency, such as a county zoning board, must be upheld on review if it is not premised upon an error of law and if the agency's conclusions reasonably may be based upon the facts proven.
>
> *   *   *
>
> Generally, a decision of an administrative agency, including a local zoning board, is owed no deference when its conclusions are based upon an error of law.

*People's Counsel for Baltimore County v. Loyola College*, 406 Md. 54, 66–67 (2008) (quotations marks, citations, ellipses, and bracketing deleted).

### 8. Original or Appellate Jurisdiction?

Now we come to the primary question on appeal: whether the District Council or the Planning Board exercises original jurisdiction over a detailed site plan approval required by the Board as a condition of preliminary site plan approval in a Euclidean zoning district. The agency with such jurisdiction is authorized to make *de novo* fact finding with regard to the merits of an application. *Zimmer*, 444 Md. at 570.

In *Zimmer*, the Court of Appeals held that the Planning Board has original jurisdiction to review and approve comprehensive design plans and specific design plans, and that the District Council review was limited to deciding whether the Planning Board's decision "is not authorized by law, is not supported by substantial evidence of record, or is arbitrary or capricious." *Id.* at 573.

The Court's analysis was primarily one of statutory interpretation. The Court began with LU § 20-202(b)(i),[22] which "provides that the county planning boards have 'exclusive jurisdiction' over 'local functions,' but does not detail each of the local functions." 444 Md. at 567. In the context of LU § 20-202 and LU § 20-207,[23] the Court observed (emphasis added):

> The Legislature did not itemize expressly or exhaustively each such intended function for apparent good reason.

---

[22] LU § 20-202(b)(i) states:

> A county planning board has exclusive jurisdiction over:
> (i) local functions, including:[ ]
> 1. the administration of subdivision regulations;
> 2. the preparation and adoption of recommendations to the district council with respect to zoning map amendments; and
> 3. the assignment of street names and house numbers in the regional district[.]

[23] LU § 20-207 states:

> (a) Subject to subsection (b) of this section, functions not specifically allocated in this subtitle shall be assigned to the Commission or to one or both of the county planning boards, as needed.
> (b) The assignments shall:
> (1) be made by resolution of the Commission with the approval of the respective county council; and
> (2) carry out the policy that local or intracounty planning functions should be performed by the county planning boards.

The RDA makes particular provision for the local functions that the Legislature did not intend to be within the planning boards' exclusive jurisdiction. LU § 20–503(c) authorizes the District Council to refer for advice only some or all building permits to the Maryland–National Capital Park & Planning Commission for review and recommendation as to zoning compliance. LU § 22–208 requires referral to the county planning boards of applications for zoning map amendments for a "recommendation." Although unclear on its face as to the standard of review, LU § 25–210 authorizes, in Prince George's County, the District Council to "review" the "final decision" of the Planning Board, and issue a "final decision."

*CDP [i.e., comprehensive design plan] and SDP [i.e., specific design plan] approvals were not among the local functions that the Legislature excepted from the planning boards' exclusive jurisdiction.* Because no alternative provision was made, *the RDA indicates to us that, like other unspecified local planning functions, the Planning Board is invested with exclusive original jurisdiction over the determination of CDPs and SDPs*, subject to appellate review by the District Council.

For the authority of the Planning Board to be "exclusive" or "original" with respect to the CDP and SDP approval processes, the Planning Board *must* be the *de novo* decision-maker regarding the merits of a CDP or an SDP. The District Council, if allowed to decide *de novo* whether a CDP or an SDP should be approved, violates the division of authority established by the RDA.[24]

---

[24] The Court also dealt with the District Council's argument that it was authorized to exercise *de novo* review pursuant to a provision of the PGCC (emphasis added):

> A provision of the county ordinance, such as PGCC § 27–132(f), that purports to give the District Council (or any other body) the authority to decide, de novo, a local function related to planning, zoning, subdivision, or the assignment of street names and house numbers, is invalid. *The District Council may not arrogate to itself original jurisdiction where the RDA places that responsibility elsewhere. Only the General Assembly, through amendment of the RDA, may accomplish that objective.*

444 Md. at 571.

*See also Zimmer*, 444 Md. at 526 n.30 ("To the extent that the Charter, or the ordinances adopted thereunder, conflict with the RDA, the Charter and ordinances are invalid and the

444 Md. at 569–70 (footnotes omitted).

FCW argues that *Zimmer's* reasoning as to comprehensive design plans and specific site plans is equally applicable to detailed site plans, the species of site plan at issue in this case. The District Council disagrees and presents three reasons why we should distinguish *Zimmer* from the present case. The first is that detailed site plans are fundamentally different from the types of site plans at issue in *Zimmer* and so the Board's decision to grant or deny a detailed site plan application is not a local function. The second and third arguments are based upon the District Council's authority to revoke the Planning Board's jurisdiction over detailed site plan applications in some circumstances and to delegate that authority to elected municipal officials. None of these contentions are persuasive.

### (A) Detailed site plan reviews when required as a condition to the approval of a subdivision application are a local function of the Planning Board.

The District Council is correct that the *Zimmer* Court discussed detailed site plans and contrasted them with the two types of site plan at issue in that case, *viz.*, comprehensive design plans and specific design plans. The Court noted that, while the review and approval processes for design plans and site plans were similar, 444 Md. at 560, those site plans play different roles in the Prince George's County land use regime than do detailed site plans. Comprehensive design plan and specific design plan approvals are two steps in the County's comprehensive design zone

RDA governs." (citing *Prince George's County v. Maryland–Nat'l Capital Park & Planning Commission*, 269 Md. 202, 223 (1973)).

28

approval process,[25] a process which the *Zimmer* Court characterized as involving "the essence of planning." 444 Md. at 535. The Court noted:

> Despite their similarities, key differences exist between the CDP and SDP process and the Detailed Site Plan process. A Detailed Site Plan is required to demonstrate that its design "represents a reasonable alternative for satisfying the site design guidelines, without requiring unreasonable costs and without detracting substantially from the utility of the proposed development for its intended use." PGCC § 27–285(a)(1). It is a method of moderating design guidelines so as to allow for greater variety of development, while still achieving the goals of the guidelines. The CDP and SDP process, in contrast, is a broader implementation of planning considerations, aimed at producing "a better environment than could be achieved under other regulations. . . . " PGCC § 27–521(a)(2). In the final analysis, CDPs and SDPs are not Detailed Site Plans by another name.

*Id.* at 562–63.

The differences between detailed site plans, on the one hand, and comprehensive design plans and specific design plans, on the other, are not dispositive. The Planning Board exercises original jurisdiction over "a local function related to planning, zoning, subdivision, or the assignment of street names and house numbers." *Zimmer,* 444 Md. at 570. Detailed site plans, at least in the context of a plan required as a condition of the approval of a subdivision application in a Euclidean zoning district, pertain to matters such as building location and design, the design of parking lots, grading, landscaping, the location

---

[25] Comprehensive design zoning district regulations are intended to incentivize development projects that: "(A) Improve the total environment; (B) Lessen the public costs associated with land development and use; (C) Fulfill the purposes of each individual Comprehensive Design Zone; and (D) Fulfill the recommendations and purposes of the General Plan, Master Plans, or Sector Plans in selected areas." PGCC § 27-476(b).

of sidewalks, streets, "waste collection facilities" (i.e., dumpsters), recreational facilities within a development, and the design of entry signs. *See* PGCC § 27-282(c). These are matters of purely local impact.

In *Zimmer,* the Court concluded that because "CDP and SDP approvals were not among the local functions that the Legislature excepted from the planning boards' exclusive jurisdiction. . . . the RDA indicates to us that, like other unspecified local planning functions, the Planning Board is invested with exclusive original jurisdiction over the determination of CDPs and SDPs, subject to appellate review by the District Council." 444 Md. at 569–70 (footnote omitted). Applying the same reasoning to detailed site plans required as a condition of the approval of a subdivision application in a Euclidean zoning district, we hold that the Planning Board is invested with original jurisdiction over such plan reviews, subject to appellate review by the District Council.[26]

### (B) LU § 25-210 does not grant the District Council original jurisdiction over Planning Board decisions in detailed site plan applications.

The other two contentions raised by the District Council are based on LU § 25-210.[27] Among other things, that statute explicitly authorizes the District Council:

---

[26] Our holding is limited to the District Council's review of Planning Board decisions in detailed site plan applications when the site plan approval is required as a condition of the Board's approval of a subdivision application in an Euclidean zoning district.

[27] LU § 25-210 states in pertinent part:

(a)(1) Subject to subsection (b) of this section, the district council may review a final decision of the county planning board to approve or disapprove a detailed site plan.
(2) A party of record may appeal to the district council a final decision by the county planning board to approve or disapprove a site plan.

30

(1) to review a final decision of the Planning Board in a detailed site plan application; (2) to revoke the Planning Board's authority to review detailed site plans in certain circumstances; and (3) to delegate detailed site plan review responsibilities to the governing body of a municipality located within the RDA.

First, the District Council contends that LU § 25-210, by necessary implication, means that the Council has original jurisdiction over all detailed site plan applications. However, as the *Zimmer* Court noted, LU § 25-210 is "unclear on its face as to the standard of review." 444 Md. at 569.

Second, the Council asserts that its statutory power to revoke the Planning Board's authority to review detailed site plan applications implies that it exercises original jurisdiction over these applications.

The problem with this argument from the District Council's perspective is that its authority to revoke and delegate under LU § 25-210(e) is subject to restrictions, which are set out in LU § 25-301(c)(3) (emphasis added):

> (3) The authority to delegate with regard to detailed site plans *does not apply* to detailed site plans:

---

(b) The district council may only decide whether to review the final approval or disapproval of a detailed site plan under this section within 30 days after the date the final approval or disapproval was issued.

\* \* \*

(d) The district council shall issue a final decision within 60 days after the date of the hearing.

(e) The district council may revoke a delegation of site plan approval authority to the county planning board only for the purpose of delegating approval authority over detailed site plans to the governing body of a municipal corporation in the regional district under § 25-301(c)(2)(ix) of this title.

31

(i) for a zone that requires detailed site plan approval by the district council;

(ii) *that are required as a condition of approval of a zoning map amendment or a preliminary plan of subdivision*;

(iii) for which the approval of a conceptual site plan or a preliminary plan of cluster subdivision is required; or

(iv) that are required for designated parcels as a specific condition of a sectional map amendment.

Thus, the District Council's revocation and delegation argument fails because the Council does not have the authority to revoke the Planning Board's authority to act on detailed site plan applications where, as in this case, the requirement for a detailed site plan was imposed by the Planning Board as a condition of subdivision approval.[28]

Accordingly, we conclude that the District Council exercised appellate jurisdiction over the Planning Board's approval of FCW's detailed site plan application. In the context of detailed site plan applications required as a condition of a subdivision approval in a Euclidean district, the District Council may reverse a decision by the Board only if that decision is "not authorized by law, is not

---

[28] The District Council attempts to buttress its revocation/delegation argument by pointing to LU § 25-302(b), which provides that if the District Council delegates detailed site plan approval to a municipality, and if someone wants to seek judicial review of a municipal detailed site plan review decision, then that person must first "appeal the action of the governing body of the municipal corporation to the district council for review on the record[.]" The short answer to the Council's argument is that the District Council simply does not have the power to revoke the Planning Board's jurisdiction in this case.

How LU § 25-302(b) affects the District Council's scope of review in an appeal from a decision from the governing body of a municipality is a question that we leave for another day.

supported by substantial evidence of record, or is arbitrary or capricious." *Zimmer*,

444 Md. at 573. The *Zimmer* Court explained that the appropriate standard of

review is analogous to the one employed by courts in judicial review actions:

> Judicial review of administrative agency action based on factual findings, and the application of law to those factual findings, is limited to determining if there is substantial evidence in the record as a whole to support the agency's findings and conclusions, and to determine if the administrative decision is based on an erroneous conclusion of law. The reviewing court may not substitute its judgment for that of the administrative agency. Rather, the court must affirm the agency decision if there is sufficient evidence such that "a reasoning mind reasonably could have reached the factual conclusion the agency reached.

*Id.* at 573 (quotation marks and citations omitted).

The District Council's scope of review is further circumscribed because the

Planning Board has discretion to grant or deny detailed site plans. *See* PGCC §§ 27-

281(a)(1) and 27-285(b).[29] Therefore, the Planning Board's decisions as to detailed

site plan applications:

---

[29] The ordinance provisions read in relevant part (emphasis added):

Section 27-281. - Purpose of Detailed Site Plans.

(a) Examples.

(1) Because the detailed design of land development significantly affects the health, safety, and welfare of the general public, and because regulation of land development through fixed standards can result in monotonous design and lower quality development, *certain types of land development are best regulated by a combination of development standards and a discretionary review of a Detailed Site Plan*.

\* \* \*

Section 27-285 – Planning Board Procedures.

\* \* \*

(b) Required findings.

33

receive an even more deferential review regarding matters that are committed to the agency's discretion and expertise. In such situations, courts may only reverse an agency decision if it is arbitrary and capricious. Logically, the courts owe a higher level of deference to functions specifically committed to the agency's discretion than they do to an agency's legal conclusions or factual findings.

*Zimmer*, 444 Md. at 573–74 (quotation marks and citations omitted).

## 9. Was the Planning Board's Decision Based on Legal Error?

In this appeal, the District Council does not contend that the evidence before the Board was insufficient to support its decision. Nor do we understand it to argue that the Board's decision was arbitrary or capricious.[30] Instead, the Council asserts that the Planning Board committed legal error by limiting its review to the three

---

> (1) The Planning Board <u>may</u> approve a Detailed Site Plan if it finds that the plan represents a reasonable alternative for satisfying the site design guidelines, without requiring unreasonable costs and without detracting substantially from the utility of the proposed development for its intended use. If it cannot make these findings, the Planning Board *may* disapprove the Plan.

The auxiliary verb "may" indicates that the decision is one left to the discretion of the Planning Board. *See, e.g., 101 Geneva LLC v. Wynn*, 435 Md. 233, 242 (2013) (In the context of Md. Rule 14-207.1, the use of the term "may" "grants a circuit court discretion in these decisions.").

[30] In *Harvey v. Marshall*, 389 Md. 243, 298 (2005), the Court considered the meaning of the terms "arbitrary" and "capricious" in the context of administrative law. The Court identified three overlapping concepts: "unreasonably or without a rational basis"; "founded on prejudice or preference rather than on reason or fact"; and "characterized by or guided by unpredictable or impulsive behavior, . . . contrary to the evidence or established rules of law." (quoting, in order, Arnold Rochvarg, MARYLAND ADMINISTRATIVE LAW, § 4.38 at 128 (2001, 2004 Supp.); BLACK'S LAW DICTIONARY 59 (8th ed. 2004); and BLACK'S LAW DICTIONARY 112.)

issues identified by the Planning Board when it imposed the detailed site plan requirement in 2003: building design, signage, and screening.

This argument is based on PGCC § 27-285(b),[31] which the District Council correctly asserts authorizes the Planning Board to approve a detailed site plan if it finds that the plan represents "a reasonable alternative for satisfying the site design guidelines without requiring unreasonable costs and without detracting substantially from the utility of the proposed development for its intended use." Thus, the District Council contends, the Planning Board had the authority to consider factors other than the building design, signage, and screening that the detailed site plan was requested for, and that the Board's failure to do so was a legal error.[32]

The flaw in the District Council's argument is that it ignores other provisions in the County Code. Although PGCC § 27-285(b) outlines the "required findings"

---

[31] PGCC § 27-285(b) states:

> (b) Required findings.
> (1) The Planning Board may approve a Detailed Site Plan if it finds that the plan represents a reasonable alternative for satisfying the site design guidelines, without requiring unreasonable costs and without detracting substantially from the utility of the proposed development for its intended use. If it cannot make these findings, the Planning Board may disapprove the Plan.

[32] In further support of its position, the District Council asserts that, "[a]ccording to the record, [the] Planning Board's review was not limited under [the] County Code to building materials and architecture, signs and screening, but included several other issues, including Master Plan conformance." However, the District Council does not direct us to any legal authority or specific documents in the record to support its contention and we will not pursue it further. *See* Md. Rule 8-504(a)(6).

for an approval of a detailed site plan by the Planning Board, PGCC § 27-286(a) specifically authorizes the Planning Board to limit the issues to be reviewed in a detailed site plan. In such instances, "specific issues to be reviewed shall be stated. Only those submittal requirements (Section 27-282) and site design guidelines (Section 27-283) *which apply to the issue shall be considered*." (emphasis added). Furthermore, PGCC § 27-269(a)(3) states in relevant part (emphasis added):

> *The reasons for requiring the review of the site plan shall be considered as criteria for approval of the site plan.* The conditional approval shall state as clearly as possible the reasons for requiring the site plan and the specific parts of the proposed development to be reviewed, which may include any of the design guidelines contained in Sections 27-274 and 27-283. The order of approvals for these types of Detailed Site Plans may be established by the authority requiring the site plan at the time the site plan requirement is imposed.

Pursuant to its authority in PGCC §§ 27-269(a)(3) and 27-286(a), the 2003 Planning Board limited the reviewable issues in the requested Site Plan to building materials and architecture, signs, and screening when it approved the Preliminary Subdivision Plan for the Property. There is no question that the Planning Board was acting in the scope of its authority when it conditioned its approval of the proposed subdivision with the requirement that the developer submit a detailed site plan. It is equally clear that the 2003 Board had the authority to limit the scope of the detailed site plan. In sum, the 2013 Board did not err when it permitted FCW to submit a limited detailed site plan for review.

Finally, the District Council contends that the Planning Board erred because it failed to address the relevant land use recommendations in the 2010 Sector Plan

and Sectional Map Amendment for Glenn Dale-Seabrook-Lanham and Vicinity (the "2010 Plan").[33] We disagree.

Initially, the Planning Board's decision explicitly states that it *did* consider the 2010 Plan. The Board's resolution approving FCW's application noted that its staff had confirmed that the site plan was consistent with the 2010 Plan. The Planning Board was entitled to rely on the recommendations of the Planning staff, which exercises expertise and discretion in making these types of determinations. *Zimmer*, 444 Md. at 535 ("Although the County Code indicates the appropriate considerations, the Planning Board (and its technical planning staff) must exercise expertise and judgment to determine whether to approve a [comprehensive design plan], wielding necessarily significant discretion in that endeavor.").

---

[33] The Commission is required to divide each county into local planning areas and to prepare area master plans for each planning area. LU § 21-105(b) and (c). Master plans "'govern a specific, smaller portion of the County and are often more detailed in their recommendations than the countywide General Plan as to that same area.'" *Maryland-Nat. Capital Park & Planning Comm'n v. Greater Baden-Aquasco Citizens Ass'n*, 412 Md. 73, 89 (2009) (quoting *Garner v. Archers Glen Partners*, 405 Md. 43, 48 n. 5 (2008) (brackets omitted)). The District Council must consider whether to direct the Commission to update each local planning area master plan on at least a sexennial basis. LU § 21-105(c)(1)(i). When this occurs, the Commission is required to review the existing master plan, shall make such amendments as it deems necessary, and may make recommendations for "zoning, the staging of development and public improvements[.]" LU § 21-105(c)(2).

Because area master plans include the Commission's recommendations for changes to the zoning classifications for individual parcels, the District Council typically enacts comprehensive re-zoning legislation, called "sectional map amendments," or "SMAs," on a subregional basis in conjunction with consideration and approval of updated area master plans for the region in question. *See* PGCC § 27-225.01.05.

To be sure, the District Council's analysis of the 2010 Plan was more extensive that was the Planning Board's. But this is not dispositive. Because the District Council exercised appellate jurisdiction over the Planning Board's decision, its proper role was to decide whether the Board's approval was supported by substantial evidence on the issues properly before the Board, and not to substitute its own judgment for the Planning Board's. *Tochterman v. Baltimore County*, 163 Md. App. 385, 406–07 (2005) ("The court cannot substitute its judgment for that of the agency, but instead must exercise a 'restrained and disciplined judicial judgment so as not to interfere with the agency's factual conclusions.'" (quoting *Stover v. Prince George's County*, 132 Md. App. 373, 381 (2000) (emphasis removed))).

## 10. The Appropriate Appellate Remedy

As a general rule, when courts decide that an administrative agency's decision is based upon an error of law, we remand the matter to the agency for further proceedings. *See, e.g., Board of Public Works v. K. Hovnanian's Four Seasons at Kent Island, LLC,* 425 Md. 482, 522 (2012). However, as the Court observed in *Zimmer,* a remand is not necessary if "'there is no administrative function that remains to be performed.'" 444 Md. at 581 (quoting *Anne Arundel County. v. Halle Development, Inc*., 408 Md. 539, 557 (2009).

In *Zimmer,* the District Council asserted that, if the Court reversed its decision because the Council applied the incorrect standard of review, then the Court should remand the case to the Council for further proceedings. 444 Md. at 581. The *Zimmer* Court agreed that this was the general rule, but it noted that a remand is not necessary where it would be futile.

*Id.* The Court ultimately concluded that a remand would be futile because the Council's reversal of the Planning Board could "only be affirmed by the courts if the Planning Board's decision was illegal, lacked substantial evidence, or was arbitrary or capricious[.]" *Id.* at 582. Because the Planning Board's decision was none of those things, "[r]emanding the case to the District Council would be futile because there was only one action the District Council could take." *Id.*

As in *Zimmer,* a remand of the present case to the District Council for further deliberations would be an exercise in futility. The Council would have no choice but to affirm the Board's decision because it was unaffected by an error of law, was based upon substantial evidence, and was not otherwise arbitrary or capricious. Therefore, we affirm the judgment of the circuit court.

**THE JUDGMENT OF THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY IS AFFIRMED. APPELLANT TO PAY COSTS.**