*Bradley E. Heard v. County Council of Prince George's, et al.*, No. 1877, Sept. Term 2021. Opinion filed on December 29, 2022, by Wells, C.J.

## ZONING – ADMINISTRATIVE REVIEW – JURISDICTION

When determining who may exercise authority over a decision involving local land use development, we analyze the relevant local planning and zoning provisions. In a District Overlay Zone, the Prince George's County zoning ordinance provisions indicate that the Planning Board exercises original jurisdiction over detailed site plan applications while the District Council exercises appellate jurisdiction over such applications.

## ZONING - STANDING – AGGRIEVEMENT – PROXIMITY

A protestant is specially aggrieved when the party is farther away than an adjoining, confronting, or nearby property owner, but still close enough to the site to be considered almost *prima facie* aggrieved, and offers "plus factors" supporting injury. When standing is at issue in a land use action, proximity is the most important factor to be considered. While there is no bright line rule for exactly how close a property must be in order to show special aggrievement, generally, protestants must demonstrate that they live no more than 1,000 feet from the subject property and offer "plus factors" such as their lay opinion of decreasing property values and increasing traffic. In this case, Mr. Heard presented land records showing that he is the record owner of property that is 990 feet from the subject property and his belief that the proposed development would diminish his property value, increase traffic, and create unsafe conditions. Because Mr. Heard has demonstrated that he is specially aggrieved by the proposed development, we hold that he has standing in this land use matter.

## ZONING – GENERAL AND MASTER PLANS – NON-BINDING ON SUBSEQUENT AMENDMENTS

General plans and master plans are generally viewed as non-binding advisory recommendations, unless a relevant ordinance or regulation makes compliance with the plan recommendations mandatory. Although Prince George's County's zoning ordinances require a preliminary plan to conform to the county's general plan and applicable master plan, no such provision exists for a detailed site plan. Instead, the Prince George's County Planning Board may apply alternative development standards from the development district standards so long as the alternative standards will benefit the development and will not substantially impair the implementation of the area master plan or sector plan. The County gives the Planning Board some discretion at this stage because the detailed site

plan process is a method of moderating design guidelines so as to allow for greater variety of development, while still achieving the goals of the guidelines.

**ZONING – ADMINISTRATIVE REVIEW – SUBSTANTIAL EVIDENCE**

Our review is limited to determining if there is substantial evidence in the record as a whole to support the agency's findings and conclusions, and to determine if the administrative decision is premised upon an erroneous conclusion of law. A conclusion by the planning body satisfies the substantial evidence test if a reasonable mind might accept as adequate the evidence supporting it. Here, the District Council did not err in concluding that there was substantial evidence in the record to support the Planning Board's finding and approval of the DSP Amendment.

REPORTED

IN THE APPELLATE COURT

OF MARYLAND*

No. 1877

September Term, 2021

_____

BRADLEY E. HEARD

v.

COUNTY COUNCIL OF PRINCE
GEORGE'S COUNTY, ET AL.
.

_____

Wells, C.J.,
Nazarian,
Ripken,


JJ.

_____



Opinion by Wells, C.J.

_____

Filed: December 29, 2022

Pursuant to the Maryland Uniform Electronic Legal Materials
Act (§§ 10-1601 et seq. of the State Government Article) this
document is authentic.



Gregory Hilton, Clerk

* At the November 8, 2022 general election, the voters of Maryland ratified a constitutional amendment changing the name of the Court of Special Appeals of Maryland to the Appellate Court of Maryland. The name change took effect on December 14, 2022.

This appeal arises from a judgment of the Circuit Court for Prince George's County, affirming the decision of the Prince George's County Council, sitting as the District Council ("District Council"), which affirmed the Prince George's County Planning Board's ("Planning Board" or "Board") approval of an Amended Detailed Site Plan (the "DSP Amendment"). The DSP Amendment is for a mixed-use residential and commercial development on property located at 6301 Central Avenue, Capitol Heights—across from the Addison Road Metro Station. The appellant, Bradley E. Heard ("Mr. Heard") lives about 1,000 feet from the subject property and opposes the project. Appellees are the District Council and 6301 Central Avenue, LLC (the "Applicant")—the developer and applicant to the DSP.[1] Mr. Heard and Appellees raise several issues, which we have rephrased and consolidated:

1. Do Mr. Heard and the District Council have standing to participate in this appeal?

2. Did the District Council err when it concluded that the Planning Board was legally correct in treating the General Plan and applicable Master Plan as advisory documents rather than binding regulations in connection with the DSP Amendment?

---

[1] As discussed more below, the Planning Board approved the original detailed site plan (DSP-06001) for a mixed-use development on the property in 2006. The first amendment to this plan (DSP-06001-01) was approved by the Planning Board and revised, in part, by the District Council in 2006, 2007 and 2008. Mr. Heard unsuccessfully challenged the first amendment in circuit court and subsequently in this Court in 2011. (CSA-REG-1306-2011). Mr. Heard also unsuccessfully challenged the Planning Board's recent approval of the Applicant's Preliminary Plan of Subdivision (Subdivision No. 4-05068) in circuit court (CAL20-14095) and subsequently in this Court (CSA-REG-1563-2021). The second amendment was withdrawn and is not relevant to this appeal. The third amendment to the original detailed site plan (DSP-06001-03) is the subject of this appeal.

3. Did the District Council err when it concluded that there was substantial evidence in the record to support the Planning Board's findings and approval of the DSP Amendment?

4. Did the District Council err when it concluded that the Planning Board was legally correct when it declined to condition approval of the DSP Amendment on offsite and site-adjacent improvements relating to bikeways, trails, and roadways?

5. Did the District Council err when it concluded that the Planning Board's findings of fact were supported by substantial evidence and untainted by legal impropriety?

For the foregoing reasons, we affirm the judgment of the circuit court.

### FACTUAL AND PROCEDURAL BACKGROUND

#### A. The Property and Proposed Development

Since 2006, the Applicant has been working towards building a mixed-use, residential and commercial development in the southwest quadrant of the intersection of MD 214 (Central Avenue) and Addison Road, with frontage on Zelma Avenue, directly across from the Addison Road Metro Station. The 2.98-acre property has three distinct parcels: Parcel A, Parcel 87 and Lot 5, Block B. Each of the prior DSP applications the Planning Board considered for this development proposed a mixed-use building on Lot A, parking on Parcel 87, and empty space on Lot 5 for future development. Mr. Heard lives at 415 Zelma Avenue, roughly 1,000 feet from the site.

#### B. How Property is Developed in General and in Prince George's County

"There are two broad categories of land use control: zoning and planning (which includes subdivision regulation)." *County Council of Prince George's County v. FCW Justice, Inc. ("FCW Justice")*, 238 Md. App. 641, 649 (2018) (citing *County Council of*

2

*Prince George's County v. Zimmer Development Co. ("Zimmer")*, 444 Md. 490, 505 (2015)). Zoning is "the process of setting aside disconnected tracts of land varying in shape and dimensions, and dedicating them to particular uses designed in some degree to serve the interests of the whole territory affected by the plan." *Maryland Overpak Corp. v. Mayor And City Council of Baltimore*, 395 Md. 16, 48 (2006). Typically, parcels must be used in compliance with their zoning. *Zimmer*, 444 Md. at 505.

Planning involves "the development of a community, not only with respect to the uses of lands and buildings, but also with respect to streets, parks, civic beauty, industrial and commercial undertakings, residential developments and such other matters affecting the public convenience[.]" *Id.* at 505-06 (quoting 1 E.C. Yokley, Zoning Law and Practice § 1-2 (4th ed. 1978)). "Because planning and zoning complement each other and serve certain common objectives, [] some implementation and enforcement procedures may have both planning and zoning aims." *Id.* at 506 (internal quotation marks and citations omitted).

The property at issue in this case (the "subject property") is within the Prince George's County portion of the Maryland-Washington Regional District, as recognized in the Maryland-Washington Regional District Act (the "RDA"), now codified in Division II of the Land Use Article of the Maryland Code. *Zimmer*, 444 Md. 490, 523 (2015). "The RDA regulates planning and zoning within the Regional District, which includes most of Prince George's and Montgomery Counties." *Id.* at 524. However, the RDA delegates the State's zoning and planning authority for the areas of Prince George's County within the Regional District to Prince George's County. *Id.* at 524-25. Thus, the RDA and the Prince George's County Code ("PGCC") govern the regulation of the subject property.

3

Specifically, the RDA allocates planning and zoning authority in Prince George's County between four distinct authorities: the Maryland-National Park and Planning Commission (the "Commission"), the Prince George's County Planning Board, the Prince George's County Council (referred to as the "District Council" when exercising its authority under the RDA), and the Prince George's County Board of Appeals. The Commission deals with *regional* planning functions, while the Planning Boards in Prince George's and Montgomery counties focus on *local* zoning and planning functions. *See* Md. Code Ann., Land Use ("LU") § 20-202.

In Prince George's County, before a developer builds on a site, there are regulations, ordinances, and development standards that affect the property and that the Planning Board must consider prior to approving any development plans. "Plans are developed to guide the implementation of land use controls and zoning in a rational way that is beneficial to the public." *Zimmer*, 444 Md. at 520. In the Maryland-Washington Regional District, two types of plans are required: a "general plan" and "area master plans." *Id.* at 521. A general plan is "'more than a detailed zoning map and should apply to a substantial area, be the product of long study, and control land use consistent with the public interest. An important characteristic of a general plan is that it be well thought out and give consideration to the common needs of the particular area.'" *Maryland-Nat. Capital Park and Planning Comm'n v. Greater Baden-Aquasco Citizens Ass'n.*, 412 Md. 73, 85 (2009) (quoting Yokley, *supra* § 5-2). The current general plan for Prince George's County is The Maryland-National Capital Park and Planning Commission, PLAN PRINCE GEORGE's 2035 APPROVED GENERAL PLAN (May 2014) (the "General Plan").

4

Master plans "govern a specific, smaller portion of the County and are often more detailed in their recommendations than the countywide General Plan as to that same area." *Greater Baden-Aquasco Citizens Ass'n*, 412 Md. at 89 (quoting *Garner v. Archers Glen Partners*, 405 Md. 43, 48 n.5 (2008) (brackets omitted)). "Proposals for land use contained in a plan constitute a non-binding advisory recommendation, unless a relevant ordinance or regulation, or specific zoning, subdivision, or other land use approval, make compliance with the plan recommendations mandatory." *Zimmer*, 444 Md. at 522. The applicable master plan for the subject property is the 2010 Approved Subregion 4 Master Plan ("Master Plan" or "applicable Master Plan").

The subject property is also in a Development District Overlay ("D-D-O") zoning district, which is intended to ensure that development in a designated district meets the goals established in a Master Plan, Master Plan Amendment or Sector Plan. PGCC § 27-548.19. D-D-O zoning districts may be designated for town centers, Metro areas, commercial corridors, employment centers, revitalization areas, historic areas and other special areas as identified in approved plans. PGCC § 27-548.19. Importantly, D-D-O zoning districts set development standards for the properties they affect. PGCC § 27-548.20.

If a site must be subdivided from a larger property, the developer must file a Preliminary Plan of Subdivision. PGCC § 24-105.[2] In Prince George's County, preliminary

---

[2] Prince George's County, MD., Mun. Code § 24-105, the version of the code in effect at the time of the public hearing when the Planning Board considered Applicant's DSP Amendment. *See Layton v. Howard Cnty. Bd. Of Appeals*, 399 Md. 36, 922 A.2d 576,

plans are necessary to determine the adequacy of public facilities serving a proposed subdivision, and to establish conformance with the County's Subdivision Ordinance. PGCC § 24-122.01. Preliminary plans often propose a general scheme of development—demonstrating the location of the property, existing topography, and the proposed layout of roads, structures, utilities, open spaces, and storm water management. Transportation, recreational facilities, and other public facilities serving the proposed subdivision are evaluated for adequacy during the Preliminary Plan stage. Before the Planning Board may approve a Preliminary Plan, it must determine that the Preliminary Plan conforms to the Master Plan. PGCC § 24-104.

Once the Planning Board has approved a Preliminary Plan, a developer must provide a Detailed Site Plan ("DSP") to the Planning Board in order to obtain a building permit. PGCC § 27-285(a). The Planning Board evaluates a DSP to establish compliance with the County's Zoning Ordinance. Urban design elements, organization and location of proposed uses, and landscaping issues are assessed at this stage. PGCC § 27-283. In a District Overlay zone, DSPs are reviewed for compliance with Development District Standards by the District Council, in a Sectional Map Amendment, or in a later amendment of adopted standards. PGCC § 27-548.19.

The Planning Board can choose to approve modified or alternative Development Standards during a DSP evaluation. PGCC § 27-281. The Planning Board may only approve a DSP with alternate Development Standards after a finding that the proposed

593 (2007) ("In land use and zoning cases, the law shall be applied as it is in effect at the time of argument.").

6

standard would benefit the development of the Development Overlay District and will not substantially impair implementation of the Master Plan, Master Plan Amendment, or Sector Plan. PGCC § 27-548.25(c). If the Planning Board approves a modification, it must state in its findings that the modification or departure conforms to all applicable Development Standards. PGCC § 27-548.25(e).

Before approving a DSP, the Planning Board must find that "the plan represents a reasonable alternative for satisfying the site design guidelines, without requiring unreasonable costs and without detracting substantially from the utility of the proposed development for its intended use." PGCC § 27-285(b). *See FCW Justice, Inc.*, 238 Md. App. at 658 ("As the Court explained in *Zimmer*, the detailed site plan process 'is a method of moderating design guidelines so as to allow for greater variety of development, while still achieving the goals of the guidelines.' 444 Md. at 562-63[.]"). Every DSP application—amendment or otherwise—is considered on its own individual merits by the Planning Board and an approved plan will supersede all previous DSP approvals. PGCC § 27-289(b).

### C. The History of Development on the Property

The Master Plan for the subject property recommends mixed-use commercial and medium-high density residential land use. The subject property is located within the R-55 (One-Family Detached Residential) (Lot 5) and C-S-C (Commercial Shopping Center) (Parcel A and Parcel 87) zones. It is subject to the Addison Road Metro Town Center Development District Overlay Zone ("District Overlay"), which has Development Standards (or "Standards") that must be applied when planning a development. The

7

property is also subject to the 2000 Addison Road Metro Town Center and Vicinity Sector Plan ("ARM Sector Plan"), 2014 Approved General Plan (Plan 2035) ("General Plan"), and the 2010 Approved Subregion 4 Master Plan.

On February 9, 2006, the Planning Board approved a Preliminary Plan of Subdivision (PGCPB Resolution No. 06-37) for Parcel A, where the Applicant proposed to build a mixed-use building. On September 21, 2006, the Planning Board approved DSP-06001 (PGCPB Resolution No. 06-217) for a mixed-use development on Parcel A consisting of 170 multifamily units and 22,696 square feet of commercial uses in an eight-story building. On May 15, 2007, the District Council elected to review the Board's approval of DSP-06001, and affirmed the Planning Board's decision, subject to certain conditions. On June 2, 2008, the District Council approved a revised condition in DSP-06001 requiring the undergrounding of all on-site utilities.

On September 25, 2008, the Planning Board approved Preliminary Plan 4-08019 (PGCPB Resolution No. 08-124) for Parcel 87, where the Applicant proposed building a parking garage.

On April 8, 2010, the Applicant submitted DSP-06001-01, which the Planning Board approved (PGCPB Resolution No. 10-50). DSP-06001-01 proposed a mixed-use development, including 171 multifamily units, 37,170 square feet of office space, a 32,820 square foot public library, 15,890 square feet of retail space, all on Parcel A, and a four-story parking garage on Lot 87.

8

On December 18, 2019, Applicant requested the Planning Board reconsider Condition 17.b[3] of Preliminary Plan of Subdivision No. 4-05068.[4] The Board granted Applicant's request for reconsideration. Mr. Heard filed a petition for judicial review in circuit court, which affirmed the Planning Board's decision. Mr. Heard appealed that judgment to this Court, which also affirmed.

On March 26, 2020, the Technical Staff[5] ("Staff") of the Planning Board reviewed the proposed third amendment to the DSP (the subject of this appeal) for its compliance with the requirements contained in the ARM Sector Plan, zoning ordinances, Preliminary Plans, previously approved DSPs, Development District Overlay, and other applicable ordinances. Staff issued a 32-page report[6] recommending approval of the DSP Amendment, subject to certain conditions. In its report, Staff recommended that the Planning Board approve some of the Applicant's requests for modifications from the requirements including increasing the setback from MD 214 and Addison Road, as well as decreasing the number of residential parking space requirements. Staff stated that the proposed building-mounted, pole-mounted, and other accent lighting, such as bollards, sconces, and other architectural lighting throughout the site met zoning requirements but

---

[3] Prohibited any left-hand turns into and from Parcel A.

[4] Approved by the Planning Board on February 9, 2006 (PGCPB Resolution No. 06-37) for Parcel A, on which the mixed-use building is proposed, subject to 18 conditions.

[5] "Technical Staff" refers to the Planning Board Staff.

[6] Following an application for a detailed site plan, the Planning Board Staff reviews the detailed site plan for the subject property and submits a report with recommendations to the Planning Board for its review.

noted that the details of the proposed lighting should be included, along with their location, in the DSP. Staff also recommended that the Planning Board approve Applicant's request for an approximately 50 percent reduction (140 parking spaces) in required residential parking spaces, noting that the layout of proposed on-site parking is broken into multiple locations. Additionally, Staff recommended raised crosswalks at all drive aisle intersections and all pedestrian crossings within the site, revised architectural elevations to remove the below-grade parking, a surface parking lot on Lot 5 of Parcel B, a 12-foot-wide sidewalk along the MD 214 frontage of the property, and five-foot-wide sidewalks along Zelma Avenue. Regarding the referral comments on the trails, the Staff noted that these improvements cannot be conditioned in the DSP Amendment because the trail is located within the right-of-way of MD 214 and is under the jurisdiction of the Maryland State Highway Administration.

On April 9, 2020, the Planning Board held a public hearing (the "Planning Board Hearing" or the "Hearing"), where it reviewed exhibits and heard testimony from Mr. Heard, Planning Board Staff, and counsel for Applicant. Specifically, parties discussed the building's setback, the surface parking lot on Parcel 87, undergrounding of utilities, safe pedestrian crossings, roadway improvements around the property, and the applicable regulations for the Planning Board's approval, among other things.

At the end of the hearing, the Planning Board voted to approve the DSP Amendment, 3:2. As approved, the DSP Amendment proposed a mixed-use building, consisting of 193 multifamily dwelling units and 11,000 square feet of commercial retail space on Parcel A and a surface parking lot on Lot 87. It modified the prior DSP by

10

eliminating a three-bedroom unit and thirty-one two-bedroom units and replacing them with an additional forty-four one-bedroom units and ten studio apartments. It also replaced the previously approved parking garage on Lot 87 with a surface parking lot divided by landed medians and proposed fewer resident parking spaces than required by PGCC at the time. Finally, the DSP Amendment proposed modifications to the Development Standards set out in the Development District Overlay, including an increased set-back from the right of way line and permission to only provide crosswalk markings at intersections.

On April 30, 2020, the Planning Board issued a 33-page Resolution (PGCPB No. 2020-59) (the "Board's decision"), considering the requirements of the ARM Sector Plan, zoning ordinances, Preliminary Plans, previously approved DSPs for the property, Development District Standards, and other ordinances, as well as the Staff's Report, and the arguments presented at the Planning Board Hearing. The Planning Board's decision, containing findings of fact and conclusions of law, ultimately approved the DSP Amendment, subject to certain conditions including the undergrounding of on-site utilities, specifications for site lighting, raised crosswalks at intersections and pedestrian crossings within the site, the construction of sidewalks on MD 214 and Zelma Avenue frontage of the property, and other items.

On June 2, 2020, Mr. Heard appealed the Planning Board's decision to the District Council, pursuant to LU § 25-210(a)(2)[7] and PGCC § 27-290(a).[8] On October 26, 2020, District Council issued its final decision affirming the Planning Board's decision to approve the DSP Amendment. In its decision, District Council explained its standard of review:

> When reviewing an appeal of a decision from Planning Board to approve a DSP application, Council may disapprove the Board's decision if the decision was not supported by substantial evidence of record, is arbitrary or capricious, or otherwise illegal. *Cnty. Council of Prince George's Cnty. v. Zimmer Dev. Co.*, 444 Md. 490, 120 A.3d 677 (2015).[9]

---

[7] LU § 25-210. Site plan review—District council
Authorized; appeal
(a)(1) Subject to subsection (b) of this section, the district council may review a final decision of the county planning board to approve or disapprove a detailed site plan.
(2) A party of record may appeal to the district council a final decision by the county planning board to approve or disapprove a site plan.

[8] PGCC Sec. 27-290. - Appeal of Planning Board's decision.
(a)The Planning Board's decision on a Detailed Site Plan may be appealed to the District Council upon petition by any person of record. The petition shall specify the error which is claimed to have been committed by the Planning Board and shall also specify those portions of the record relied upon to support the error alleged. The petition shall be filed with the Clerk of the Council within thirty (30) days after the date of the notice of the Planning Board's decision. The District Council may vote to review the Planning Board's decision on its own motion within thirty (30) days after the date of the notice. A copy of the petition shall be sent by the submitter to all persons of record (by regular mail), and a certificate of service shall accompany the submission to the Clerk.

[9] Alternatively, Council may affirm, reverse, modify or remand the application to the Planning Board. If the Council fails to act within the specified time, the Planning Board's decision is automatically affirmed. PGCC § 27-290(d).

12

District Council then addressed all fifteen issues raised by Mr. Heard on appeal of the Planning Board's decision including many of the questions presented in this appeal. After a thorough review of the record, District Council found that the Planning Board's approval of the DSP Amendment was supported by substantial evidence in the record, and was not arbitrary, capricious, or otherwise illegal, and affirmed the Planning Board's decision.

On November 23, 2020, pursuant to LU § 22-407,[10] and Md. Code Ann., State Gov't ("SG"), § 10-222(a),[11] Mr. Heard filed a petition in the Circuit Court for Prince

---

[10]

(a)(1) Judicial review of any final decision of the district council, including an individual map amendment or a sectional map amendment, may be requested by any person or entity that is aggrieved by the decision of the district council and is:
　　(i) a municipal corporation, governed special taxing district, or person in the county;
　　(ii) a civic or homeowners association representing property owners affected by the final decision;
　　(iii) the owner of the property that is the subject of the decision; or
　　(iv) the applicant.

(f)(1) A final judgment of the circuit court may be appealed to the [Appellate Court of Maryland] by:
　　(i) the district council;
　　(ii) the applicant; or
　　(iii) any aggrieved party to the circuit court proceedings.
(2) Each member of the district council is entitled to vote on whether the district council shall appeal to the [Appellate Court of Maryland], regardless of whether the member participated in the hearing on the matter or in the decision.

[11]

(a)(1) Except as provided in subsection (b) of this section, a party who is aggrieved by the final decision in a contested case is entitled to judicial review of the decision as provided in this section.
(2) An agency, including an agency that has delegated a contested case to the Office, is entitled to judicial review of a decision as provided in this section if the agency was a party before the agency or the Office.

13

George's County for judicial review of District Council's decision affirming the Planning Board's decision approving the DSP Amendment. On December 23, 2020, District Council filed a response to Mr. Heard's Petition ("Response") stating its intent to participate in Mr. Heard's petition for judicial review.[12]

On February 3, 2021, Appellees filed a joint motion to dismiss Mr. Heard's petition on the basis that he lacked standing to challenge the District Council's decision ("Appellees' Joint Motion to Dismiss"). On February 22, 2021, Mr. Heard filed a memorandum in opposition to Appellees' Joint Motion to Dismiss, as well as his own motion to strike District Council's Response to his Petition ("Appellant's Motion to Strike") pursuant to Md. Rule 7-204(a).[13] Although the circuit court considered these motions, it did not rule explicitly on them.[14]

---

[12] District Council's Response did not state under what authority it was responding. However, Md. Rule 7-204, titled "Response to Petition" provides:

    **(a) Who May File; Contents.** *Any person, including the agency, who is entitled by law to be a party and who wishes to participate as a party shall file a response to the petition. The response shall state the intent to participate in the action for judicial review. No other allegations are necessary.*
    **(c) Time for Filing Response; Service.** *A response shall be filed within 30 days after the date the agency mails notice of the filing of the petition* unless the court shortens or extends the time. The response need be served only on the petitioner, and shall be served in the manner prescribed by Rule 1-321.

(Emphasis added).

[13] *See* footnote 12.

[14] The parties agree that this Court should deem the motions to have been denied. *See Mathis v. Hargrove*, 166 Md. App. 286, 302 (2005) ("We begin by accepting appellants' premise that the circuit court's reservation of its ruling on the motion for summary judgment effectively operated to deny the motion.").

The circuit court did, however, conduct a hearing on the merits of Mr. Heard's petition for judicial review and entered an order on January 5, 2022 ("Order" or "Judgment") affirming District Council's decision affirming the Planning Board's decision to approve the DSP Amendment, and denying Mr. Heard's petition. Specifically, the circuit court ruled that the Planning Board: applied the correct development standards and received substantial evidence to approve the DSP Amendment; did not err in refusing to condition approval of the DSP Amendment on offsite bikeway, trail, and roadway improvements; and made the requisite findings regarding the DSP Amendment. Mr. Heard filed his timely notice of appeal from this Order on January 26, 2022, and Applicant filed its timely cross-appeal on January 31, 2022.

**STANDARD OF REVIEW**

"When we review the final decision of an administrative agency, [ . . . ] we look through the circuit court's [ . . . ] decisions, although applying the same standards of review, and evaluate the decision of the agency." *People's Counsel for Balt. Cnty. v. Loyola College*, 406 Md. 54, 66-67 (2008). The issue here is whether the Planning Board or the District Council made the "final decision." Mr. Heard argues that the final decision is the Planning Board's decision because it has original jurisdiction over the approval of detailed site plans, while District Council only has appellate jurisdiction. Appellee, however, contends that District Council ultimately has original jurisdiction over such approvals.

This Court's reasoning in *City of Hyattsville v. Prince George's Cnty. Council* is instructive on this issue. 254 Md. App. 1 (2022). That case involved a District Council decision to approve an application to rezone part of the parcel and change the list of allowed

15

uses to permit townhouses for a property, as is the case here, in a development district overlay zone. *Id.* at 35, 38. In deciding that changing permitted uses in a D-D-O zone implicated the District Council's original jurisdiction, Judge Arthur analyzed the pertinent provisions of Prince George's zoning ordinance to determine whether "these provisions treat the District Council as the primary and final decision-maker on a request to change the underlying zone or allowed uses for a property in the development district." *Id.* at 36. We answered that question in the affirmative. *Id.*

In the present case, the relevant County zoning ordinance provisions include:

PGCC § 27-548.22(a), which states that

> The uses allowed on property in a Development District Overlay Zone shall be the same as those allowed in the underlying zone in which the property is classified, *except as modified by Development District Standards approved by the District Council*.

PGCC § 27-548.23(b), which provides that

> *Development District Standards may modify density regulations only to meet the goals of the Development District* and the purposes of the D-D-O Zone. Development District Standards may not permit density in excess of the maximum permitted in the underlying zone.

PGCC § 27-548.23(e), which states:

> The Master Plan, Master Plan Amendment, or Sector Plan[15] may specify the location and size of proposed roads and transit facilities.

---

[15] Although master plans must be approved by the Planning Board, they become effective only when approved by the District Council. *See* LU § 21-216; PGGC § 27-646(c). Sector plans are "detailed plans for the development of a portion of one or more master planning areas." PGCC § 27-107(a)(206.2). Sector plans are widely used in both Montgomery and Prince George's Counties and are approved by the relevant District Council. *See Pringle v. Montgomery Cnty. Planning Board,* 212 Md. App. 478, 480–81 (2013).

16

PGCC § 27-548.25, which states in relevant part:

> (a)    Prior to issuance of any grading permit for undeveloped property or any building permit in a Development District, *a Detailed Site Plan for individual development shall be approved by the Planning Board . . . .*

> (b)    *In approving the Detailed Site Plan, the Planning Board shall find that the site plan meets applicable Development District Standards.*

> (c)    If the applicant so requests, the Planning Board may apply development standards *which differ from the Development District Standards*, most recently approved or amended by the District Council, *unless the Sectional Map Amendment text specifically provides otherwise. . . .*

(Emphasis added).

In enacting PGCC § 27-548.22 and § 27-548.23, the District Council drew a clear distinction between changes to uses permitted in a D-D-O district, maximum density in the district, and the location of and size of road and transit facilities in a D-D-O district. Section 27-548.23 is explicit that as to all of these matters, the "District Council [is] the primary and final decision-maker on a request" to amend permitted uses, maximum permitted density, and the relocation of streets and transit facilities. *City of Hyattsville*, 254 Md. App. at 36. In contrast, when the District Council enacted § 27-548.25, it made it clear that it is the role of the Planning Board to review and approve detailed site plans.

None of the parties assert that the text of Sectional Map Amendment restricted the Planning Board's authority under § 27-548.25(c). Thus, these provisions indicate that the Planning Board exercises original jurisdiction over detailed site plan applications and that the District Council's review of such decisions is appellate in nature.

17

Exercising appellate jurisdiction, "the District Council may reverse a decision by the Board only if that decision is 'not authorized by law, is not supported by substantial evidence of record, or is arbitrary or capricious.'" *FCW Justice*, 238 Md. App. at 674-75 (quoting *Zimmer*, 444 Md. at 573). As the Supreme Court of Maryland (at the time called the Court of Appeals of Maryland)[16] explained in *Zimmer*, the appropriate standard of review of an administrative agency's action is analogous to that used by courts in judicial review:

> Judicial review of administrative agency action based on factual findings, and the application of law to those factual findings, is limited to determining if there is substantial evidence in the record as a whole to support the agency's findings and conclusions, and to determine if the administrative decision is based on an erroneous conclusion of law. The reviewing court may not substitute its judgment for that of the administrative agency. Rather, the court must affirm the agency decision if there is sufficient evidence such that a reasoning mind reasonably could have reached the factual conclusion the agency reached.

*Zimmer*, 444 Md. at 573 (quotation marks and citations omitted).

Further, because the Planning Board has discretion to approve or disapprove detailed site plans, *see* PGCC §§ 27-281(a)(1) and 27-285(b), its decisions regarding detailed site plan applications receive even more deference. *FCW Justice*, 238 Md. App. at 675.

---

[16] At the November 8, 2022 general election, the voters of Maryland ratified a constitutional amendment changing the name of the Court of Appeals of Maryland to the Supreme Court of Maryland. The name change took effect on December 14, 2022. *See*, *also*, Md. Rule 1-101.1(a) ("From and after December 14, 2022, any reference in these Rules or, in any proceedings before any court of the Maryland Judiciary, any reference in any statute, ordinance, or regulation applicable in Maryland to the Court of Appeals of Maryland shall be deemed to refer to the Supreme Court of Maryland….").

> Agency decisions receive an even more deferential review regarding matters that are committed to the agency's discretion and expertise. In such situations, courts may only reverse an agency decision if it is arbitrary and capricious. Logically, the courts owe a higher level of deference to functions specifically committed to the agency's discretion than they do to an agency's legal conclusions or factual findings.

*Zimmer*, 444 Md. at 573-74 (quotation marks and citations omitted).

## DISCUSSION

### I. Mr. Heard Has Standing to Participate in This Appeal.

#### A. Parties' Contentions

Before we address the merits of this appeal, we must first address whether Mr. Heard and District Council have standing. Appellees argue that this case should have been dismissed by the circuit court because Mr. Heard does not have standing. Appellees contend that Mr. Heard is not prima facie, specially, or directly aggrieved by the District Council's final decision essentially because he lives more than 1,000 feet from the proposed development. Mr. Heard responds that the circuit court was correct in determining that he had standing because he in fact does live within 1,000 feet of the subject property and has sufficiently alleged special aggrievements arising out of the proposed development.

Further, Mr. Heard argues that the circuit court erred in failing to dismiss the District Council as an interested party. Specifically, Mr. Heard asserts that because the District Council reviewed the Planning Board's decision in its quasi-judicial capacity, it therefore "had no cognizable legal interest or stake in the outcome of Applicant's proposed development." In response, District Council contends that it was acting as an administrative

agency and, under LU § 22-407, District Council is legally entitled to seek a further right of appeal from a circuit court's final judgment so long as the Council participated in the proceedings below. Moreover, District Council argues that Mr. Heard relies on the *McKinney-Peco* doctrine, which is inapplicable here, and, has since been abrogated.[17]

## B. Analysis

Land Use § 22-407(a) authorizes the judicial review of land use decisions by the District Council. When the circuit court entered its judgment, § 22-407(a) read in pertinent part:

> (a)(1) Judicial review of any final decision of the district council, including an individual map amendment or a sectional map amendment, may be requested by any person or entity that is aggrieved by the decision of the district council and is:
>
> (i) a municipal corporation, governed special taxing district, or person in the county;
>
> (ii) a civic or homeowners association representing property owners affected by the final decision;
>
> (iii) the owner of the property that is the subject of the decision; or

---

[17] The view that cases like *Zoning Appeals Bd. v. McKinney*, 174 Md. 551 (1938) and *Md. Bd. of Pharmacy v. Peco, Inc.*, 234 Md. 200 (1964) stood for the proposition that an agency may not seek appellate review of a circuit court decision when the circuit court overruled the agency's final administrative decision upon judicial review. *See Maryland-National Capital Park & Planning Comm'n v. Anderson*, 395 Md. 172, 202 (Harrell, J., dissenting). Although this doctrine has not been expressly overruled, more recent case law indicates that "when the agency's decision does or can have significance in terms of the agency's broader responsibilities, the limitations of *McKinney* are not applicable. In such a case, the agency must be free to intervene in judicial review actions and contest in the appellate courts judgments that may hamper it from effectively implementing the policies ordained by the Legislature." *Calvert Cnty. Planning Comm'n v. Howlin Realty Mgmt., Inc.*, 364 Md. 301, 319 (2001).

(iv) the applicant.

Mr. Heard is a resident of Prince George's County and owns property there.

Regarding standing in land use cases in Maryland, two conditions must be met: "(1) [the person or entity] must have been a party to the proceeding before the Board, and (2) [the person or entity] must be aggrieved by the decision of the Board." *Bryniarski v. Montgomery Cnty. Bd. of Appeals*, 247 Md. 137, 143 (1967), *partially abrogated by statute*, Md. Code (1982, 2013 Repl. Vol.), § 5-204(f) of the Environment Article, *as stated in Patuxent Riverkeeper v. Md. Dep't of Env't*, 422 Md. 294, 298 (2011). There is no dispute that Mr. Heard was a party to the proceeding before the Planning Board, so we turn to whether he is "aggrieved."

Generally, a party is deemed aggrieved if the party can demonstrate that the decision will adversely affect the party's interest in a personal and specific manner, not shared by the general public. *See Ray v. Mayor & City Council of Balt.*, 430 Md. 74, 81 (2013); *Bryniarski*, 247 Md. at 144. There are three ways a party may prove standing: (1) proximity; (2) special aggrievement; or (3) direct and specific harm. *See Ray*, 430 Md. at 85-86. "A protestant is *prima facie* aggrieved when his proximity makes him an adjoining, confronting, or nearby property owner." *Id.* at 85. A protestant is specially aggrieved when the party is farther away than an adjoining, confronting, or nearby property owner, but "still close enough to the site" to be considered "almost *prima facie* aggrieved, *and* offers 'plus factors' supporting injury." *Id.* Finally, a protestant who is far removed from the subject property may still have standing if the party can show "his personal or property rights are specially and adversely affected by the board's action." *Id.* at 85-86.

21

Where standing is at issue in a land use action, "proximity is the most important factor to be considered." *Id.* at 82-83. While there is "no bright-line rule for exactly how close a property must be in order to show special aggrievement[,]" generally, a protestant must demonstrate that they live no more than 1,000 feet from the subject property and offer "plus factors" such as "an owner's lay opinion of decreasing property values and increasing traffic[.]" *Id.* at 83-85, 91-92. As explained by the Court in *Ray*:

> Although there is no bright-line rule for who qualifies as "almost" *prima facie* aggrieved, we have found no cases, in which a person living over 2000 feet away, has been considered specially aggrieved. Rather, [. . .] this category has been found applicable only with respect to protestants who lived 200 to 1000 feet away from the subject property. *See Habliston*, 258 Md. at 352, 354-55, 265 A.2d at 885-87 (protestants held specially aggrieved when 200 to 500 feet from site; owner testified regarding decrease in value); *Chatham*, 252 Md. at 579-80, 584, 251 A.2d at 2, 4 (protestants with proximity of 1000 feet, within the same subdivision who could see site of zoning change were specially aggrieved).
> On the contrary, protestants who lived more than 1000 feet from the rezoning site have repeatedly been denied standing. *See Shore Acres*, 251 Md. at 312, 317-18, 247 A.2d at 403, 406 (not specially aggrieved when 3760 feet and out of sight of subject property); *White*, 251 Md. at 64, 246 A.2d at 250-51 (not specially aggrieved when 0.5 miles from site, even though asserting an increase in traffic, increase in use of water system, and overcrowded schools); *DuBay*, 240 Md. at 182-84, 185-86, 213 A.2d at 488-90 (three protestants—1500 feet, 0.4 miles, and 0.9 miles—who were separated by beltway or could not see site, not specially aggrieved); *Marcus*, 235 Md. at 537-38, 541, 201 A.2d at 778-79, 781 (protestant living 0.75 miles away who could not see subject property denied standing); *25th Street*, 137 Md. App. at 86, 89, 767 A.2d at 920, 922 (protestant two blocks west and three blocks north, without sight of, or sound from, subject property, denied standing).

*Id.* at 91-92.

In this case, Mr. Heard is the record owner of the property at 415 Zelma Avenue, a 60-feet-wide lot, described in the deed as "Lot numbered Thirty-four (34) and adjoining or

22

South 20 feet by full depth of Lot numbered Thirty-three (33)[.]" *See* Plat Book RNR 2, Plat 34; Deed Book 30028, pp. 173-76. The subject property owned by Applicant includes the property at 212 Zelma Avenue, more particularly described as Lot 5, Block B, of King's Seat Pleasant Section 2 subdivision. *See* Plat Book WWW 16, Plat 61. The eastern boundary of King's Seat Pleasant Section 2 subdivision is 1,327.74 feet long. The southern boundary of Lot 5, Block B, of King's Seat Pleasant Section 2 subdivision is 277.74 feet from the northeastern limit of that subdivision. The northern boundary of Mr. Heard's property—the midway point of Lot 33—is 60 feet from the southern boundary of King's Seat Pleasant subdivision. Based on land records, the distance between Mr. Heard's property and the subject property is 990 feet (1,327.74 – 277.74 – 60 = 990 feet).

Additionally, Mr. Heard has alleged "plus factors," specifically his lay opinion that Applicant's proposed development of the subject property will likely diminish his property values, increase traffic, and create unsafe conditions.

As for Mr. Heard's potential standing here, the Court's decision in *Chatham Corp. v. Beltram*, 252 Md. 578 (1969) is instructive. In *Chatham*, two homeowners opposed the Board of Howard County's approval of a decision reclassifying a residential zoning district to permit apartments. *Id.* at 579-80. Both homeowners testified that their property was approximately 1,000 feet from the subject property and that they believed the rezoning would depreciate the value of their property. *Id.* at 580. In light of this testimony, the Court held that the homeowners were specially aggrieved. *Id.*

Because Mr. Heard has presented sufficient evidence supporting the fact that he owns property within 1,000 feet of the subject property and has alleged "plus factors," he

has demonstrated special aggrievement and therefore has standing to seek judicial review in this matter.

As for Mr. Heard's argument that the circuit court erred in failing to dismiss the District Council as an interested party, we decline his and District Council's invitation to address the issue of District Council's standing because the property owner is also a party in the judicial review action. *See, e.g., State Ctr. LLC v. Lexington Charles Ltd. P'ship*, 438 Md. 451, 550 (2014); *Fraternal Ord. of Police Lodge 35 v. Montgomery County*, 436 Md. 1, 13 n.13 (2013); *Garner v. Archers Glen Partners, Inc.*, 405 Md. 43, 54-55 (2008) (declining to address whether the Prince George's County Planning Board may participate as a party in a judicial review of its decision approving a Preliminary Plan for a residential development where issue was not preserved and it was conceded that the developer had standing to appeal). In *Garner*, the Court explained:

> It "is a settled principle of Maryland law that, 'where there exists a party having standing to bring an action ... we shall not ordinarily inquire as to whether another party on the same side also has standing.'" *Sugarloaf Citizens' Ass'n v. Dep't of Env't,* 344 Md. 271, 297, 686 A.2d 605, 618 (1996) (quoting *People's Counsel v. Crown Dev. Corp.,* 328 Md. 303, 317, 614 A.2d 553, 559–60 (1992)); *Dorsey,* 375 Md. at 67 n. 1, 825 A.2d at 392–93 n. 1; *Md. Ass'n of Health Maint. Orgs. v. Health Servs. Cost Review Comm'n,* 356 Md. 581, 589–90, 741 A.2d 483, 487 (1999); *Coalition for Open Doors v. Annapolis Lodge No. 622, Benevolent & Protective Order of Elks,* 333 Md. 359, 371, 635 A.2d 412, 417 (1994); *County Council v. Md. Reclamation,* 328 Md. 229, 232 n. 1, 614 A.2d 78, 80 n. 1 (1992); *Bd. of Supervisors of Elections of Anne Arundel County v. Smallwood,* 327 Md. 220, 233 n. 7, 608 A.2d 1222, 1228 n. 7 (1992); *Bd. of License Comm'rs for Montgomery County v. Haberlin,* 320 Md. 399, 404, 578 A.2d 215, 217 (1990); *Montgomery County v. Bd. of Supervisors of Elections for Montgomery County,* 311 Md. 512, 517 n. 3, 536 A.2d 641, 643 n. 3 (1988); *State's Attorney of Balt. v. City of Balt.,* 274 Md. 597, 602, 337 A.2d 92, 96 (1975). Our traditional reluctance to address issues of standing not necessary to the outcome of a case is highlighted in *Sugarloaf Citizens Ass'n*

*v. Northeast Maryland Waste Disposal Authority,* 323 Md. 641, 650 n. 6, 594 A.2d 1115, 1119 n. 6 (1991). There we declined to address a possible standing issue because it was unnecessary, noting "[i]n light of our decision on the merits, we need not and do not reach any issue of standing."

\* \* \*

[W]e ordinarily do not decide issues of standing where it is undisputed that one party on each side of the litigation has standing. Thus, we decline Petitioner's invitation to address the issue of standing where unnecessary to do so in order to decide the outcome of the case.

*Id.*

In this case, it is undisputed that Applicant, the current subject property owner and developer, and applicant of the DSP Amendment, who participated in the judicial review below, has standing in this appeal. Therefore, because addressing the issue of District Council's standing is unnecessary to deciding the outcome of this case, we decline to address the issue.

**II.  District Council Did Not Err When It Concluded that the Planning Board Was Legally Correct in Treating the General Plan and Applicable Master Plan as Advisory Documents Rather than Binding Regulations in Connection with the DSP Amendment.**

**A.  Parties' Contentions**

Mr. Heard asserts that the Planning Board erred as a matter of law by failing to consider the recommendations of the General Plan or Subregion 4 Master Plan, or by viewing these plans as merely advisory and not binding on the DSP Amendment. District Council and Applicant counter that approval of a DSP does not require conformance to the applicable Master Plan or the General Plan.

**B.  Analysis**

25

We review the administrative agency's legal conclusions with less deference than its factual findings, "and may reverse those decisions where the legal conclusions reached by that body are based on erroneous interpretation or application of zoning statutes, regulations, and ordinances relevant and applicable to the property that is the subject of the dispute." *Greater Baden-Aquasco Citizens Ass'n*, 412 Md. at 84. However, even with respect to certain legal issues, "an administrative agency's interpretation and application of the statute which the agency administers should ordinarily be given considerable weight by reviewing courts. Furthermore, the expertise of the agency in its own field should be respected." *Motor Vehicle Admin. v. Shea*, 415 Md. 1, 14-15 (2010) (quoting *Motor Vehicle Admin. v. Delawater*, 403 Md. 243, 256-57 (2008) (quoting *Aviation Admin. v. Noland*, 386 Md. 556, 571-72 (2005))).

As discussed in *Zimmer*, general plans contain "at a minimum, recommendations for development in the respective county and supporting analysis[.]" 444 Md. at 521. "[A]rea master plans" apply to certain local areas and typically govern "specific, smaller portions of a county and are usually more detailed than general plans overlapping the same area." *Id*. at 521-22. A "sector plan" is a detailed plan for the development of a portion of a master planning area. It is defined as:

> A comprehensive plan for the physical development of a portion of one or more planning areas, showing in detail such planning features as type, density and intensity of land uses, pedestrian traffic features, public facilities (parking structures, public open space, rapid transit station, community service provisions, and the like), and relationship of the various uses to transportation, services, and amenities within the area of the sector plan and, where appropriate, to other areas. The sector plan may include maps, graphics, and text and is designated as the sector plan for the area which it encompasses.

PGCC § 27-107(a)(206.2).

Review of this application is subject to three plans: (1) the Addison Road Metro Town Center and Vicinity Sector Plan (ARM Sector Plan); (2) the 2010 Approved Subregion 4 Master Plan (Master Plan); and (3) the 2014 Approved General Plan (Plan 2035) (General Plan). "[C]omprehensive plans [like the General Plan here] which are the result of work done by planning commissions and adopted by ultimate zoning bodies, are advisory in nature and have no force of law absent statutes or local ordinances linking planning and zoning." *Friends of Frederick County v. Town of New Market*, 224 Md. App. 185, 199 (2015) (internal quotation marks omitted); *Zimmer*, 444 Md. at 522 ("Proposals for land use contained in a plan constitute a non-binding advisory recommendation, unless a relevant ordinance or regulation, or specific zoning, subdivision, or other land use approval, make compliance with the plan recommendations mandatory."); *Greater Baden-Aquasco Citizens Ass'n*, 412 Md. at 98 (noting that Master Plans are generally viewed "as non-binding advisory recommendations, unless a governing statute or ordinance clearly elevates them to the status of a regulatory device.")

Thus, we turn to the PGCC to see if it makes conformity with the Master Plan, ARM Sector Plan, and General Plan mandatory for DSP approval. PGCC § 27-281(b)(1)(A) states that one of the general purposes of detailed site plans is to provide for development "in accordance with the principles for the orderly, planned, efficient and economical development contained in the General Plan, Master Plan, or other approved plan[.]". However, under the Planning Board procedures, "[r]equired findings," "[t]he Planning

27

Board may approve a Detailed Site Plan if it finds that the plan represents a reasonable alternative for satisfying the site design guidelines, without requiring unreasonable costs and without detracting substantially from the utility of the proposed development for its intended use." PGCC § 27-285(b)(1)(A).

Mr. Heard argues that PGCC § 27-281(b)(1)(A) transforms the Master Plan into a binding regulation on the DSP Amendment. For this proposition, Mr. Heard relies on *Greater Baden-Aquasco Citizens Ass'n*, in which the Supreme Court of Maryland considered "whether the [Prince George's County] Planning Board, at the least, must consider the General Plan's numeric growth objective when determining whether to approve or reject a preliminary subdivision plan." 412 Md. at 97. The Court held that the Planning Board should have considered the General Plan's numeric residential growth objective. *Id.* at 110. As the Court noted, the Master Plan stated that it was intended to be "in accordance" with the General Plan. *Id.* at 107. Thus, the Court reasoned that:

> [t]he Planning Board, in determining whether a preliminary subdivision plan conforms to the Master Plan, either must offer some analysis of how the preliminary subdivision plan under consideration may impact the long-term growth objective established in the General Plan or explain why such an analysis or conclusion is not required[] . . . What the Board cannot do, however, is ignore entirely a patently relevant element of the Plan.

*Id.*

Although a court typically accords deference to the administrative body's interpretation of regulations routinely before it, the Court found that the Planning Board did not even consider a relevant and applicable provision of the Master Plan, as required by County regulations. *Greater Baden-Aquasco Citizens Ass'n*, 412 Md. at 109. Instead,

the Board simply determined "that the application was 'not inconsistent with'" the General Plan's policies. *Id.* The Court considered this "a broad conclusory statement[,]" unsupported by the facts in the record and therefore, "not entitled to deferential review." *Id.*

However, Appellees respond that Mr. Heard's reliance on *Greater Baden-Aquasco Citizens Ass'n* is misguided because that case involved the approval of a *preliminary subdivision* plan, not a detailed site plan. *See id.* at 97. Recently, this Court considered whether the District Council or the Planning Board exercises original jurisdiction over a *detailed site plan* approval required by the Board as a condition of preliminary site plan approval. *FCW Justice*, 238 Md. App. at 668. In *FCW Justice*, we explained the detailed site plan review process and requirements:

> The legislative premise of the detailed site plan review process is that "regulation of land development through fixed standards can result in monotonous design and lower quality development, [therefore] *certain types of land development are best regulated by a combination of development standards and a discretionary review*…." PGCC § 27-281.
>
> * * *
>
> Before deciding to approve a detailed site plan, the Planning Board *must* find that "the plan represents a reasonable alternative for satisfying the site design guidelines, without requiring unreasonable costs and without detracting substantially from the utility of the proposed development for its intended use." PGCC § 27-285(b). As the Court explained in *Zimmer*, *the detailed site plan process "is a method of moderating design guidelines so as to allow for greater variety of development, while still achieving the goals of the guidelines*." 444 Md. at 562-63[.]

*Id.* at 656-58 (emphasis added). Thus, Appellees conclude, although a *preliminary plan* must conform to the applicable Master Plan and General Plan, PGCC § 24-121,[18] the County Council, when adopting the County Code, determined that conformity to the General Plan and applicable Master Plan would not be re-tested at the DSP stage.

Relatedly, Mr. Heard argues that under PGCC § 27-548.25(c),[19] although the Planning Board is allowed to consider alternative development standards from the ARM Sector Plan when requested by the Applicant, such proposals cannot "substantially impair implementation of the Master Plan, Master Plan Amendment, or Sector Plan." But, as discussed above, Appellees counter that under PGCC § 27-285(b) and this Court's

---

[18] "(a) The Planning Board shall require that proposed subdivisions conform to the following:

(5) The preliminary plan and final plat shall conform to the area master plan, including maps and text, unless the Planning Board finds that events have occurred to render the relevant recommendations within the comprehensive plan no longer appropriate, is no longer applicable, or the District Council has not imposed the recommended zoning. Notwithstanding any other requirement of this Section, a proposed preliminary plan or final plat of subdivision may be designed to conform with the land use policy recommendations for centers, as approved within current County general plan. In such cases, the Planning Board may approve a preliminary plan application as may be designed to conform with the land use policy recommendations for centers, as duly approved within the current General Plan."

[19] "If the applicant so requests, the Planning Board may apply development standards which differ from the Development District Standards, most recently approved or amended by the District Council, unless the Sectional Map Amendment text specifically provides otherwise. The Planning Board shall find that the alternate Development District Standards will benefit the development and the Development District and will not substantially impair implementation of the Master Plan, Master Plan Amendment, or Sector Plan."

discussion in *FCW Justice*, conformity to the General Plan and Master Plan is not required for DSP approval.

Furthermore, the Planning Board's decision reviewed the DSP Amendment for compliance with the Preliminary Plans for Parcel A and Parcel 87.[20] Since preliminary plans must conform to the General and applicable Master Plan, it stands to reason that inherent in the evaluation of a detailed site plan's compliance with its preliminary plan requirements, is the consideration of the General and applicable Master Plan. In other words, since conformity with the General and applicable Master Plan is tested at the Preliminary Planning stage, it does not need to be tested for such conformity again at the DSP stage.

This planning procedure was clarified at the Planning Board Hearing by District Council's Principal Counsel, David Warner:

> MADAM CHAIR: Are you, let me make sure I'm clear on that. I want to make sure I'm clear on that, Mr. Wright [sic]. Are you saying they're not controlling, for instance, Plan 2035 is the General Plan, we all know the General Plan is a policy document. It serves as a guide for future development. It does not, they do have value and it does not mean that we can just willy-nilly ignore it up to the extent, but each plan that's approved thereafter, the Sector Plans, the Master Plans, the Sector Plans and then these other individual applications are *refinements*.

---

[20] At the Planning Board Hearing, Ms. Conner, with the Subdivision and Zoning section of the Commission, explained that there was no preliminary plan of subdivision for Lot 5, Block B because there was no development proposed on the lot at that time. Further, Ms. Conner explained that under the previous DSP, the Applicant had agreed to re-record the plats for the three parcels pursuant to PGCC § 24-108(a)(3) ("A final plat may be filed with the Planning Director and treated as a minor final plat for which no preliminary plan is required in the following instances: . . . The sale or exchange of land between adjoining property owners to adjust common boundary lines or consolidate lots, provided that in no case shall additional lots be created and that all properties are the subject of a record plat.").

MR. WARNER: Yes, so, yes absolutely. They are incredibly valuable documents and they guide planning, absolutely. However, and we refer to them in the Staff Report to help us inform or to help staff inform their decision making as you know any other kind of outside document we refer to whether it's new urbanism or some other kind of, you know, I don't know that we've adopted any new urbanism specifically. But we do rely on other documents that the county and the Planning Board have adopted to inform our review.

[MR. WARNER]: *But as far as determining whether a Detailed Site Plan can be approved, we look to what the Zoning Ordinance provides and requires. And the Zoning Ordinance does not require compliance with General Plan 2035 or the Subregion 4 Plan in order to approve this DSP.*

(emphasis added). Each plan approved after the General Plan is a "refinement" of the prior plan. From that, it follows that a development proposal which complies with the applicable sector plan also complies with the relevant master plan. The District Council's arguments are persuasive. The District Council did not err when it concluded that the Planning Board was legally correct in treating the General and Master Plan as advisory rather than binding documents at the DSP stage.

III. **The District Council Did Not Err When It Concluded that there Was Substantial Evidence in the Record to Support the Planning Board's Findings and Approval of the DSP Amendment.**

A. **Parties' Contentions**

Mr. Heard contends that the Planning Board abused its discretion, and acted arbitrarily and capriciously, despite the evidence adduced in the record and the requirements of the applicable plans, by approving the DSP Amendment. Specifically, Mr. Heard argues that the Planning Board abused its discretion by approving a large surface parking lot on Parcel 87, approving an alternative standard that would allow Applicant to increase the building setback from the street, failing to require Applicant to provide safe

32

pedestrian crossings, permitting Applicant to delay construction of sidewalks, failing to require Applicant to provide sufficient streetlighting, and failing to require Applicant to provide for the undergrounding of utilities.

Appellees counter that the Planning Board's decision to grant the requested modifications to the Development Standards is supported by substantial evidence in the record.

### B. Analysis

The Planning Board may approve a DSP as long as it finds that the plan represents a reasonable alternative for satisfying the site design guidelines (as outlined in PGCC § 27-274), without requiring unreasonable costs or substantially detracting from the utility of the proposed development. PGCC § 27-285(b)(1). In order to approve the DSP, the Planning Board must find that the site plan satisfies applicable Development District Standards. PGCC § 27-548.25(b). If the applicant requests development standards that differ from those in the Development District Overlay, the Planning Board may apply the alternate development standards so long as the Planning Board finds that the alternate standards will benefit the development and not substantially impair implementation of the Master Plan, Master Plan Amendment, or Sector Plan. PGCC § 27-548.25(c).

"Our review is 'limited to determining if there is substantial evidence in the record as a whole to support the agency's findings and conclusions, and to determine if the administrative decision is premised upon an erroneous conclusion of law.'" *Greater Baden-Aquasco Citizens Ass'n*, 412 Md. at 84 (quoting *United Parcel Serv., Inc. v. People's Counsel for Balt. Cnty.*, 336 Md. 569, 576 (1994)). "A conclusion by [the

33

planning body] satisfies the substantial evidence test 'if a reasonable mind might accept as adequate' the evidence supporting it." *Id.*

### 1. *Surface Parking Lot on Parcel 87*

Mr. Heard argues that the Planning Board erred or abused its discretion by approving a 0.9-acre surface area parking lot on Parcel 87. Development District Standard S2 provides: "[s]ingle, large surface parking lots are not permitted. Instead, parking shall be provided in smaller defined areas separated by planted medians." But, Mr. Heard ignores the fact that the proposed surface parking lot features several land planted medians, as shown on the plans and demonstrated at the Planning Board Hearing. It would be reasonable for the Planning Board to conclude that these medians break up the parking lot into "smaller defined areas separated by land planted medians." Additionally, with respect to Mr. Heard's argument that Applicant should have negotiated for shared parking with the Metro parking garage across the street from the site, Applicant explained at the Hearing before the Board that County Code requires Applicant to have those spaces "in perpetuity if they're provided offsite[,]" and "WMATA wouldn't necessarily give us a long term lease or anything that would satisfy that legal obligation." Thus, there is substantial evidence in the record to support the Planning Board's finding that the DSP Amendment regarding parking complies with Development Standard S2.

### 2. *Increased Setback and Teaser Parking*

Next, Mr. Heard argues that the Planning Board abused its discretion when it approved Applicant's proposal for an increased setback from MD 214 and Addison Road, as well as ten surface parking spaces between the eastern building façade and Addison

Road South. Specifically, Mr. Heard argues that the increased setback breaks from the Development District Standards. Development District Standard S3(C) states: "[a] front build-to line between 10 and 15 feet from the right-of-way line shall be established for office, retail/commercial and institutional buildings which front onto MD 214 and Addison Road." Additionally, Mr. Heard argues that the particular development breaks from the new urbanist principles, such as continuous building edges and consistent setbacks, as reflected in the Development District Standards' goal for the building site and setback standards: "[t]o provide a consistent setback close to the right-of-way line or street edge without an attached row or block of commercial buildings. Setbacks should maintain a continuous building edge to define the public zone of the street." Finally, Mr. Heard contends that Applicant's "purported justification" for "teaser parking," which he concludes is "solely for the use and benefit of automobile drivers," is inconsistent with the Sector Plan's transit and pedestrian-oriented goals.

Yet, the Planning Board received substantial evidence justifying its approval of the modification to the setback requirement. On December 18, 2019, prior to Mr. Bishop's Staff Report, Mr. Omar A. Karim, President of Banneker Ventures (Applicant/Developer of the subject development), responded to Mr. Bishop's comment about the setback standards. Mr. Karim explained that a larger setback would be appropriate, in part, to avoid the WMATA underground metro tunnel zone of influence. "Constructing a building closer or over the WMATA zone of influence will greatly increase the construction of the project, which will increase the financial risks to the project making it less likely for the developer to be able to secure the type of funding needed to construct the project." At the Hearing,

35

Mr. Karim explained to the Planning Board that in Prince George's County, retail rent will average $1.50 to $2.50 per square foot, but that would increase to $3.50 to $5.00 a square foot for retail built in the zone of influence, which is cost-prohibitive. Mr. Karim testified that building in the zone of influence could add at least $5 million in costs to the Project. Additionally, the Chair of the Planning Board, Ms. Hewlett, commented that "new urbanism doesn't necessarily mean that [a 10-15 foot setback] is the only way to have the setback, that it's got to be uniform."

The Planning Board also heard testimony from Ms. Stephanie Farrell, an architect with Torti Gallas Partners (an architecture and planning firm), who clarified that "[i]t is not that you cannot create a new urbanist active pedestrian mixed-use environment and have surface parking." She explained that teaser parking would "make it easy or clear to vehicular patrons that there is parking[,]" which "helps make the retail successful and does not, I think, detract from the ability to make it an urban mixed-use building." Ultimately, the Planning Board found that given the site constraints combined with the possibility of future development on Parcel 87, that the setback amendment would benefit the proposed development without substantially impairing implementation of the ARM Sector plan. Thus, the Planning Board's approval of the amendment to the setback standards was based on substantial evidence in the record.

### 3. *Sidewalks*

Next, Mr. Heard argues that the Planning Board erred or abused its discretion by allowing Applicant to delay the construction of eight-foot-wide sidewalks and five-foot-wide planting strips along the adjacent Addison Road South rights-of-way and 12-foot-

wide hiker/biker trail along MD 214. On the DSP Amendment, Applicant noted that it proposed to delay construction of these sidewalks until the completion of improvements to MD 214 by another developer. Mr. Heard argues that without these sidewalks, the Central Avenue frontage of the subject property is not pedestrian-friendly and unsafe.

ARM Development District Standard P2(C) provides that "[s]idewalks shall be set back from the curb on MD 214 and Addison Road to provide a safe and comfortable walking environment. Sidewalks should be made of concrete paving or better, be a minimum of five-feet in width, and should provide a five-foot-wide grass strip for the planting of shade trees…". While these Standards require the implementation of the eight-foot-wide sidewalks and five-foot-wide planting strips and the hiker/biker trail, they do not specify a time for implementation. Applicant indicated it will implement the sidewalk improvements after another developer makes improvements at the intersection of MD 214 and Addison Road. Applicant argues that the nature and scope of these improvements are such that any sidewalk or planning strip implemented prior to these improvements would be affected. Further, the Planning Board determined that it made more sense for Applicant to construct the sidewalks after the road is improved because the road improvements are "subject to the jurisdiction of other agencies" and therefore, requiring Applicant to construct the sidewalks before the MD 214 and Addison Road improvements would be inefficient and wasteful. For example, if Applicant's sidewalks were constructed *before* nearby road improvements were made, those sidewalks would be damaged or destroyed by subsequent improvements. Thus, we conclude that there was substantial evidence in the

record to support the Planning Board's finding that the delayed construction of the sidewalks was a reasonable alternative from the Development Standards.

### 4. *Lighting*

Next, Mr. Heard argues that the Planning Board erred or abused its discretion by approving the DSP Amendment without ornamental pole-mounted streetlights along the adjacent MD 214, Addison Road South, and Zelma Avenue rights-of-way.

Development District Standard P5, which concerns lighting in the subject area, requires that "[a]t the time of the first site plan in **Metro West** or **Addison South**, a consistent type of ornamental pole and luminaire shall be selected in consultation with DPW&T." (emphasis in original). However, there are no development standards requiring an applicant to implement a specific type of ornamental pole-mounted streetlight along off-site, adjacent rights-of-way at the subject site. As discussed more later on in this opinion, the Planning Board does not have the authority to condition approval for the DSP Amendment on off-site improvements by Applicant. The Planning Board addressed this issue at the Hearing, explaining that many of the improvements Mr. Heard seeks, including the lighting, "[are] outside of the property that they are subject to the jurisdiction of other agencies."

However, the Planning Board did have the authority to condition approval of the DSP Amendment on Applicant providing more information about its proposed on-site lighting, which it did. At the hearing, Ms. Farrell testified that "[t]here is a combination of bollards at the plazas and the residential entrance that are created off of Central and then [] in the parking lot it would be larger pole lighting . . . and building mounted lighting as

well." She added that this lighting would be decorative, and that Applicant would add lighting to "any additional walkways that are created inside the right of way." Thus, there is substantial evidence in the record to support the Planning Board's finding that Applicant complied with Standard P5.

### 5. *Underground Utilities*

Finally, Mr. Heard contends that the Planning Board erred or abused its discretion by approving the DSP Amendment, which failed to show the placement underground of all existing and proposed utilities along the adjacent MD 214, Addison Road South, and Zelma Avenue rights-of-way.

Development District Standard P6 requires "future development in the town center shall place all utilities underground." Although the DSP Amendment does not show the undergrounding of utilities along the adjacent rights-of-way, Condition 1.c of the Resolution requires Applicant to: "[r]evise the site plan to show all on-site utility lines and facilities, for utilities that serve the subject property and the proposed project, as being placed underground." Accordingly, the Planning Board has already required what Mr. Heard is seeking. Therefore, we conclude that the District Council did not err when it concluded that there was substantial evidence in the record to support the Planning Board's findings and approval of the DSP Amendment.

**IV. The District Council Did Not Err When It Concluded that the Planning Board Was Legally Correct in Declining to Condition Approval of the DSP Amendment on Offsite and Site-Adjacent Improvements Relating to Bikeways, Trails, and Roadways.**

**A. Parties' Contentions**

Mr. Heard argues that the Planning Board erred as a matter of law because it refused to condition approval of the DSP Amendment on offsite and site-adjacent improvements relating to bikeways, trails, and roadways, such as connecting Zelma Avenue with MD 214 and adding pedestrian crossing at Addison Road and Zelma Avenue.

Appellees respond that the Planning Board is only empowered to condition approval of the DSP Amendment on roadway improvements at the time of subdivision pursuant to Md. Code Ann., Land Use, §§ 23-104(c), 23-103(a). Additionally, Appellees contend that the proposed trails and bike paths cannot be a condition of the DSP Amendment because the right-of-way is under the jurisdiction of the Maryland State Highway Administration.

### B. Analysis

Mr. Heard contends that the Planning Board failed to make necessary improvements to the rights-of-way adjacent to its property to connect Zelma Avenue to MD 214, and to provide safe crossings across MD 214, MD 332, and Addison Road South. To support his argument, Mr. Heard relies on Development Standard P1, which provides in relevant part:

F. Intersections should employ "safe-crosses." This treatment enhances pedestrian safety by expanding the sidewalk area in the unused portion of the on-street parking lane adjacent to the intersection. []

G. Zelma Avenue shall remain and connect into the road network.

H. Old Central Avenue shall be removed from Rollins Avenue eastward. Rollins Avenue shall be extended north to East Capitol Street to facilitate traffic movement to MD 214 both east and westbound. New development shall accommodate the proposed closing of Old Central Avenue and not become an obstacle to future planned roads.

40

However, the Planning Board rejected this argument because it is only empowered to make the exactions Mr. Heard seeks at the subdivision—not DSP—stage. Land Use Article § 23-104(b) provides in relevant part:

(c)(1) [. . .], the subdivision regulations may include provisions for:

(ii) the coordination of roads within the subdivision with:
    1. existing planned or platted roads;
    2. features of the regional district;
    3. that county's general plan; or
    4. a transportation plan adopted by the Commission as part of that county's general plan.

Further, under LU § 23-103(a), land dedication for roads occurs at the time of the "subdivision plat," i.e., a Preliminary Plan.

(a) […] [I]n connection with the approval of a subdivision plat, the appropriate county planning board may require a dedication of land for:

(1) an interior subdivision road;

(2) a road that abuts the subdivision for the purpose of creating a new road as part of the plan of subdivision to provide for traffic access to another subdivision road; and

(3) the widening of an existing or public road that abuts the subdivision for the purpose of providing additional right-of-way adequate to serve additional traffic that will be generated by the subdivision.

Moreover, the authority to regulate roadway and other off-site improvements is not included in the purposes for which the local law may regulate. *See* LU § 22-104.

At the hearing, the Planning Board considered Mr. Heard's request for off-site improvements. Initially, the Board asked its Principal Counsel, Mr. Warner, whether Mr. Heard's requested conditions could be included in the DSP Amendment, but the Board

41

ultimately determined Mr. Heard's requests were not within the purview of the DSP approval.

> MADAM CHAIR: Well one of the things that might be the adjacent roadways that need to be made into full intersections. Because I don't know that we have the ability to do that.

> MR. WARNER: [T]he improvements to roadways are something that is analyzed at the time of Preliminary Plan of Subdivision and what is required in terms of those improvements is decided at that time. The issues that you're looking at now are more design related when they come to things like parking and lighting and those kinds of issues.

> MADAM CHAIR: But even to make the roadways full intersections that would come from the Public Works and Transportation or State Highway Administration.

> MR. WARNER: Well many of the design improvements that [Appellant] addressed such as when are the sidewalks going to be built, why isn't the lighting being put in. Yes, a lot of those are subject, they're outside of the property that they are subject to the jurisdiction of other agencies.

As Mr. Warner explained, while the Planning Board may have had the authority to condition approval of the Preliminary Plan application on these off-site roadway improvements, it did not have such authority at the time of DSP.

Regarding Mr. Heard's proposed trails and bike paths, in its decision, the Planning Board adopted a memorandum, in which the Transportation Planning Section reviewed the DSP Amendment for conformance with the 2009 Approved Countywide Master Plan of Transportation and the conditions of prior approvals. That memorandum acknowledged that the planned bike lanes will be constructed along Addison Road and MD 214, but that these improvements cannot be conditioned with the DSP Amendment because "the trail is located within the right-of-way of MD 214 and is under the jurisdiction of the Maryland

42

State Highway Administration (SHA) […].” The Board's Decision also adopted a memorandum, in which SHA indicated that this application was not required to construct the improvements on MD 214.

We conclude that the District Council did not err when it determined that the Planning Board was legally correct when it declined to condition approval of the DSP Amendment on Mr. Heard's suggested offsite and site-adjacent improvements relating to bikeways, trails, and roadways.

V. **The District Council Did Not Err When It Concluded that the Planning Board's Findings of Fact Were Supported by Substantial Evidence and Untainted by Legal Impropriety.**

A. **Parties' Contentions**

Mr. Heard argues that the Planning Board erred by not specifically addressing or ruling on any of his proposed findings of fact, but instead, simply adopting the Planning Staff's Report. Additionally, Mr. Heard contends the Board erred by relying on the District Council's "ultra vires" modifications of DSP 06001-01.

Appellees respond that the Planning Board was not required to address Mr. Heard's proposed findings or rule on each fact that he proposed, the Board simply *could* adopt the findings of the Planning Staff Report. Additionally, Appellees argue that the Board did not improperly rely on any findings made by the District Council's review of DSP 06001-01 when it approved the DSP Amendment.

B. **Analysis**

We begin with the observation that "there is no requirement that the Board must set out in its findings of fact a discussion of all of the evidence." *Ocean Hideaway Condo.*

43

*Ass'n v. Boardwalk Plaza Venture*, 68 Md. App. 650, 661 (1986) (involving an appeal of a zoning decision made by the Ocean City Board of Zoning Appeals to permit construction of a seventeen-story building). Furthermore, a Planning Board may rely on a Staff Report as long as it "is thorough, well conceived, and contains adequate findings of fact." *Greater Baden-Aquasco Citizens Ass'n*, 412 Md. 73, 110 (2009) (noting that a Planning Board's "rote repetition" of the Technical Staff Report does not necessarily indicate a lack of meaningful fact-finding).

Here, the record includes a thorough Staff Report, which reviewed the DSP Amendment for compliance with the ARM Sector Plan, zoning ordinances, Preliminary Plans, prior DSPs, and Development District Standards. Based on its findings, the Report recommended that the Planning Board approve the DSP Amendment subject to certain conditions, and also recommended that the Board approve some of the Applicant's modification requests, such as an increased setback and decreased residential parking space requirements, among other items discussed above. The record also includes a long transcript from the Planning Board Hearing, where Mr. Heard was able to present his arguments to the Board and examine Planning Board staff and Applicant witnesses regarding his proposed findings of fact. In its over-thirty-page Decision, the Planning Board addressed all of the relevant criteria: compliance with the Development Standards and requests to make modifications, zoning ordinances, Preliminary Plans, previously approved DSPs, and other requirements. The Board's decision also addressed the Hearing, discussing the evidence and specific issues presented. Considering all this information, the Planning Board made its Decision:

After considering the entire record including presentations of M-NCPPC staff, the Technical Staff Report, the case presented by the applicant, all testimony and submitted documentation, and applicable law, the Planning Board determines the application meets the requirements of law and approves the DSP application pursuant to the findings contained in this Resolution embodying the Board's final decision.

Finally, Mr. Heard contends that the Planning Board improperly relied on previously approved DSPs for this site. When considering approval of an amendment to a DSP, the Board must make the same findings as it would when considering approval of the original DSP. PGCC § 27-289(b). That, in fact, is what the Planning Board did here, as discussed above. The fact that the Board noted that the previously approved DSPs were relevant because they addressed many of the same factors at issue in this DSP Amendment, does not mean the Board did not consider this DSP Amendment anew. Notwithstanding this argument, as Appellees point out, Mr. Heard appealed the District Council's review of DSP 06001-01 and did not prevail in the circuit court or in his prior appeal to this Court. *See Heard v. Prince George's Cnty. Council, et al.,* No. 1306, September Term 2011 (Decided: April 16, 2014). Because Mr. Heard failed to raise this issue during that appeal, he is barred from doing so now. *Loveday v. State*, 296 Md. 226, 229 (1983) ("Once this Court has ruled upon a question properly presented on an appeal, or, if the ruling be contrary to a question that could have been raised and argued in that appeal on the then state of the record, as aforesaid, such a ruling becomes the 'law of the case' and is binding on the litigants and courts alike[.]") (quoting *Fid.-Balt. Nat. Bank & Tr. Co. v. John Hancock Mut. Life Ins. Co.*, 217 Md. 367, 372 (1958)). Accordingly, we conclude that the

45

District Council did not err when it determined that the Planning Board's findings of fact were supported by substantial evidence and were untainted by legal impropriety.

**JUDGMENT OF THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY AFFIRMED. APPELLANT TO PAY THE COSTS.**